**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 1, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

No. 11-8078

JOHN LLOYD WHITLEY,

     Defendant - Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 1:11-CR-00058-CAB-1**)

---

On the briefs: *

Raymond P. Moore, Federal Public Defender, and Daniel G. Blythe, Assistant Federal Public Defender, Office of the Federal Public Defender for the District of Wyoming, Cheyenne, Wyoming, for Appellant.

Christopher A. Crofts, United States Attorney, and Kerry J. Jacobson, Assistant United States Attorney, Office of the United States Attorney for the District of Wyoming, Lander, Wyoming, for Appellee.

---

Before **O'BRIEN, TYMKOVICH,** and **MATHESON,** Circuit Judges.

---

     *After examining Appellant's brief and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**MATHESON**, Circuit Judge.

John Lloyd Whitley was pulled over in his truck based on information that he was a felon in possession of a firearm. During the stop, officers observed two firearms in plain view and found another firearm and ammunition in their subsequent search of the vehicle.

Mr. Whitley was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He filed a motion to suppress, arguing that the stop was not justified. After the district court denied his motion to suppress, Mr. Whitley entered a conditional guilty plea.

Mr. Whitley appeals the district court's denial of his motion to suppress. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A. *Factual History*

On September 2, 2010, John Powley, a special agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives, received a call from Ed Newell, a former Fremont County prosecutor. Mr. Newell worked for a company that had recently employed Mr. Whitley. Mr. Newell told Agent Powley that he had received a report that an employee had witnessed Mr. Whitley with a gun in a company vehicle. Mr. Newell also told Agent

Powley that other employees found a spent .38-caliber shell casing while cleaning Mr. Whitley's company vehicle.

Based on this information, Agent Powley began investigating whether Mr. Whitley was a felon in possession of a firearm. He obtained a copy of Mr. Whitley's driver's license and court records showing that Mr. Whitley was a convicted felon. He also planned to conduct interviews and obtain a warrant to search Mr. Whitley's vehicle and residence.

Before he could do so, on September 10, 2010, the opening day of general license antelope hunting season, Agent Powley received another call from Mr. Newell. Mr. Newell told Agent Powley that he saw Mr. Whitley loading an antelope into the back of his pickup truck. Based on this information, Agent Powley inferred that Mr. Whitley was probably in possession of a firearm.

Agent Powley contacted the Fremont County Sheriff's Office and the Wyoming Game and Fish Department. He gave them a description of Mr. Whitley's truck and requested that they stop Mr. Whitley for a valid traffic stop because he suspected that Mr. Whitley was unlawfully in possession of a firearm.[1] Agent Powley also set out to search for Mr. Whitley.

---

[1] Agent Powley testified that:

I basically told them that I believe Mr. Whitley may be in possession of a firearm, and that if they could make a valid traffic stop, that basically that he

Continued . . .

Soon after receiving Agent Powley's instructions, Sergeant Daniel McOmie, a Fremont County sheriff's officer, was told by a fellow officer that Mr. Whitley had driven into an area that was reduced to one lane due to construction. Sergeant McOmie waited for Mr. Whitley to emerge from the construction area. When he did so, Sergeant McOmie pulled in behind him and saw the antelope carcass in the back of his truck.

When they approached an area where it was safe to pull over, Sergeant McOmie activated his lights and initiated a stop. At the suppression hearing, Sergeant McOmie explained his purpose in initiating the stop:

> A: [M]y purpose was to initiate a stop based on observation of the antelope carcass.
>
> I also had the alternative request from . . . Agent Powley, to check and see if there were any firearms in that vehicle.
>
> Q: What type of investigation would you characterize your interest in the antelope as?
>
> A: One of our duties, and any peace officer in the state of Wyoming can check, per Title 23, antelope coupons and carcasses, to see if they're properly tagged.
>
> My understanding, through my training, was that the number one offense in Game and Fish law is the proper tagging—

---

may be in possession of a firearm, and he would not—he was prohibited from possessing it, and if that happened, to give me a call.

ROA, Vol. 3, at 14.

Sergeant McOmie testified that: "Agent Powley advised me that he was in the process of obtaining a search warrant for Mr. Whitley. And he said if I could make contact with Mr. Whitley, that he would like it if I would check, check and see if he had firearms with him, quite frankly." *Id.* at 36.

. . .

Q: Would it be fair to say that [proper tagging] is, in fact, what you were investigating at the time that you pulled over the defendant?

A: Yes. I based my stop on the fact that he had a dead antelope in the back of his truck.

I initiated the stop. And the first thing in our conversation was, I asked Mr. Whitley for his hunting license and carcass tag.

ROA, Vol. 3, at 39-41.

During his inspection of the truck, Sergeant McOmie spotted two rifles in plain view along the center console of the truck. Sergeant McOmie examined Mr. Whitley's hunting license and concluded that he was in compliance with Wyoming law. Sergeant McOmie testified that he "didn't examine the antelope closely enough to determine [whether it had been shot with a rifle] because . . . the method . . . wasn't relevant to the taking." *Id.* at 53.

Sergeant McOmie then contacted Agent Powley and told him about the firearms. Agent Powley responded to the stop, and he and Sergeant McOmie searched Mr. Whitley's truck. They found a 7-mm bolt-action rifle and a .223-caliber bolt action rifle in plain view in the front seat area. They also found a .410-caliber shotgun and 7-mm ammunition in the backseat and .38-caliber ammunition in the glove box.

Because they did not locate a .38-caliber gun to match the ammunition from the glove box, Agent Powley obtained Mr. Whitley's consent to search his home. After searching Mr. Whitley's home, Agent Powley located more .223-caliber ammunition, two other firearms that allegedly belonged to Mr. Whitley's wife, but did not find a .38-

caliber firearm. Mr. Whitley told Agent Powley that his father had the .38-caliber firearm.

**B. *Procedural History***

Mr. Whitley was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Mr. Whitley filed a motion to suppress the evidence that the officers found in his truck, arguing that the officers had neither reasonable suspicion nor probable cause to stop Mr. Whitley. After a hearing, the district court denied Mr. Whitley's motion. It held that "[Sergeant] McOmie was justified in stopping [Mr. Whitley's] vehicle to investigate compliance with state hunting regulations, and he had a particularized and objective basis for suspecting [Mr. Whitley] of being a felon in possession of a firearm." ROA, Vol. 1, at 37.

Mr. Whitley then pled guilty pursuant to a conditional plea agreement under Fed. R. Crim. P. 11(a)(2). On September 9, 2011, the district court sentenced Mr. Whitley to 24 months in prison and three years of supervised release, and it imposed a $100 special assessment.

## II. DISCUSSION

Mr. Whitley challenges the district court's denial of his motion to suppress. He argues that probable cause, rather than reasonable suspicion, was required to initiate the stop and that the officers lacked justification under either standard.

**A. *Probable Cause vs. Reasonable Suspicion***

Mr. Whitley argues that the stop in this case was invalid because it was not based on a traffic violation and lacked probable cause. He appears to argue that probable cause is required for a traffic stop in the absence of a traffic violation. We disagree.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Probable cause is generally required before an officer may conduct a search or a seizure. *See O'Connor v. Ortega*, 480 U.S. 709, 722-23 (1987); *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) ("Ordinarily, a search—even one that may permissibly be carried out without a warrant—must be based upon probable cause to believe a violation of the law has occurred." (quotations omitted)). But in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court established that a law enforcement officer may, in appropriate circumstances and in an appropriate manner, approach a person to investigate possible criminal behavior even if he lacks probable cause to arrest. *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 278 (2011). Such "[a]n investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Id.* (quotations omitted).

"Because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, the principles set forth in *Terry v. Ohio* guide [our] determination as to the reasonableness of a traffic stop." *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012) (quotations omitted) (citation omitted); *United States v. Chavez*, 660 F.3d

-7-

1215, 1221 (10th Cir. 2011) ("The principles governing investigative detentions outlined in *Terry v. Ohio* govern the lawfulness of traffic stops." (quotations omitted) (citation omitted)). Although we often state that "[a] traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction," *see, e.g.*, *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009), the lawfulness of such a stop is not limited to situations where an officer suspects a traffic or equipment violation.

Instead, we apply the same standard as for a *Terry* stop, whether or not the vehicle stop involves a traffic violation. Such a stop is justified if "the officer bears a reasonable suspicion that criminal activity may be afoot." *United States v. Cortez-Galaviz*, 495 F.3d 1205-06 (10th Cir. 2007) (quotations omitted); *Winder*, 557 F.3d at 1135 ("An officer may initiate a traffic stop once he has reasonable suspicion that criminal activity is, has, or is about to occur." (quotations omitted)); *United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir. 1997) ("In order to conduct a lawful investigatory stop of a vehicle, the detaining officers must have, based on all the circumstances, a particularized and objective basis for suspecting the particular person stopped of criminal activity." (quotations omitted)); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("[The Fourth Amendment's] protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest . . . [T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." (quotations omitted)).

In *Arvizu*, the Supreme Court upheld a vehicle stop made in the absence of an observed traffic violation. 534 U.S. at 271-72. The Court held that the stop was justified because the officer had reasonable suspicion that the driver was smuggling drugs. *Id.* at 277. Numerous other cases have determined a traffic stop to be valid when it is based on reasonable suspicion of criminal activity unrelated to a traffic offense. *See*, *e.g.*, *United States v. Cortez*, 449 U.S. 411, 415-16 (1981) (suspicion of smuggling illegal aliens); *Leos-Quijada*, 107 F.3d at 793 ("[W]e conclude that [the deputy] was entitled to stop the vehicle to investigate further his suspicions that the occupants were involved in smuggling activities.").

Thus, the officers were required to have reasonable suspicion, not probable cause, that Mr. Whitley was engaged in criminal activity, and the criminal activity need not be limited to a traffic offense.[2]

---

[2]Mr. Whitley also relies on Wyo. Stat. Ann. § 23-6-109 to argue that we should apply a probable cause standard. Wyo. Stat. Ann. § 23-6-109(b) provides that "any person authorized to enforce the provisions of this act may search without warrant any . . . motor vehicle . . . for any *wildlife* which he has *probable cause* to believe was taken or is possessed illegally." (Emphasis added). This statute is irrelevant to our analysis because (1) we rely on Agent Powley's reasonable suspicion that Mr. Whitley was a felon in possession of a firearm rather than Sergeant McOmie's subjective belief that he stopped Mr. Williams to investigate a hunting violation, and (2) the statute addresses probable cause to search, not probable cause to stop a vehicle. We also note this court's statement in reviewing a district court's denial of a suppression motion under the Fourth Amendment that "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (quotation omitted).

**B.** *Reasonable Suspicion that Mr. Whitley was Involved in Criminal Activity*

On appeal of a district court's denial of a motion to suppress, "we review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment, but we accept the district court's factual findings unless they are clearly erroneous and we view the evidence in the light most favorable to the prevailing party." *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012).

**1.** *Reasonable Suspicion and the Collective Knowledge Doctrine*

"Although reasonable suspicion requires an officer to act on something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required is considerably less than proof by a preponderance of the evidence or that required for probable cause." *Chavez*, 660 F.3d at 1221 (quotations omitted). "In determining whether reasonable suspicion exists, we look to the totality of the circumstances, rather than assessing each factor or piece of evidence in isolation." *McHugh*, 639 F.3d at 1256 (quotations omitted). "[A]n officer need not rule out the possibility of innocent conduct; he or she simply must possess some minimal level of objective justification for making the stop." *Winder*, 557 F.3d at 1134 (quotations omitted).

When determining whether reasonable suspicion justifies a stop, "we defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *McHugh*, 639 F.3d at 1256 (quotations omitted). "[W]e consider the reasonableness of an officer's actions using an objective standard." *Id.* (quotations omitted). "The detaining officer's subjective beliefs and intentions are, quite simply,

irrelevant." *Id.* (quotations omitted); *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) ("It is . . . irrelevant that the officer may have had other subjective motives for stopping the vehicle."). Thus, "we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *McHugh*, 639 F.3d at 1256 (quotations omitted).

Under the collective knowledge doctrine, the officer who makes the stop need not have reasonable suspicion that criminal activity is afoot. Instead, the knowledge and reasonable suspicions of one officer can be imputed to another. *See United States v. Chavez*, 534 F.3d 1338, 1345-46 (10th Cir. 2008). The collective knowledge doctrine has two categories—horizontal and vertical. *Id.*

Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action. *Id.*[3] In *United States v. Hensley*, 469 U.S. 221 (1985), the Supreme Court held that when officers initiated a *Terry* stop based on a flyer or bulletin, reliance on the flyer or bulletin was proper so long as *the officers that issued the flyer* had a reasonable suspicion about

[3]Under the horizontal collective knowledge doctrine, a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard. *See Chavez*, 534 F.3d at 1345. The inquiry in such a circumstance is "whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge" to satisfy the relevant standard. *Id.*

the person it targeted. *Id.* at 231-32. Thus, an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself. *See Chavez*, 534 F.3d at 1347-48 (upholding a stop when federal agent who requested officer to stop the suspect had "all the requisite probable cause components" but did not communicate them to the officer).

### 2. *Applying the Vertical Collective Knowledge Doctrine*

Agent Powley had reasonable suspicion that Mr. Whitley was a felon in possession of a firearm. Sergeant McOmie was justified in relying on Agent Powley's request to conduct the stop. Agent Powley received a tip from Mr. Newell that a firearm and spent ammunition had been seen in Mr. Whitley's company vehicle. After a records check, Agent Powley learned that Mr. Whitley was a felon. Finally, Agent Powley received another tip from Mr. Newell that he saw Mr. Whitley loading a dead antelope into his truck on the first day of hunting season. This information was enough for a reasonable officer to believe that Mr. Whitley was a felon in possession of a firearm. *See Alabama v. White*, 496 U.S. 325, 328-29 (1990) (explaining that a tip may be insufficient for probable cause but sufficient for reasonable suspicion); *Illinois v. Gates*, 462 U.S. 213, 233-35 (1983) (discussing characteristics of reliable informants and explaining that

tips from reliable informants can form the basis of probable cause); *Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (crediting tip given by known informant).[4]

To argue that the stop was invalid, Mr. Whitley erroneously relies on Sergeant McOmie's testimony that his "purpose was to initiate a stop based on observation of the antelope carcass," ROA, Vol. 3, at 39, and that he was investigating whether the antelope was properly tagged. Under the collective knowledge doctrine, we need only consider whether the officer requesting the stop had reasonable suspicion and need not consider whether the officer making the stop independently had reasonable suspicion. *See United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011), *cert. denied*, 131 S. Ct. 2922 (2011). Thus, we need not consider Sergeant McOmie's stated basis for stopping Mr. Whitley.

Even if we were to do so, an officer's subjective motives for making a stop are not relevant in determining whether there was reasonable suspicion. *See McHugh*, 639 F.3d at 1256; *Botero-Ospina*, 71 F.3d. at 787. Sergeant McOmie testified that he "had the alternative request from . . . Agent Powley, to check and see if there were any firearms in the vehicle." ROA, Vol. 3, at 39. Agent Powley told Sergeant McOmie that Mr. Whitley

---

[4]Although we need only rely upon Agent Powley's basis for reasonable suspicion, Sergeant McOmie was independently aware of most of the information supporting Agent Powley's reasonable suspicion. Sergeant McOmie knew that Mr. Whitley was a felon. He also saw the antelope carcass in the back of Mr. Whitley's truck before he initiated the stop. Sergeant McOmie's independent knowledge of these facts adds to and is part of the collective knowledge supporting the reasonable suspicion that Mr. Whitley was a felon in possession of a firearm.

was likely in possession of a firearm and that he had been working toward obtaining a warrant. Thus, Agent Powley essentially instructed Sergeant McOmie to stop Mr. Whitley based on his suspicion that he was a felon in possession of a firearm. It is this suspicion, not Sergeant McOmie's subjective motive, which is relevant to our analysis.

Mr. Whitley also contends that during the general hunting season, in addition to hunting with firearms, hunting with a bow and arrow or black powder rifle is permitted.[5] Thus, he argues that his possession of the antelope does not necessarily mean that he used a firearm to kill it. But "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277; *McHugh*, 639 F.3d at 1256 ("[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality."). The possibility that Mr. Whitley could have killed the antelope with a weapon other than a prohibited firearm does not mean that Agent Powley or Sergeant McOmie did not have reasonable suspicion that he possessed a firearm.

### III.    CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Mr. Whitley's motion to suppress.

---

[5]The definition of "firearm" in 18 U.S.C. § 921(a)(3) excludes "antique firearm[s]." "Antique firearm[s]" include muzzle loading rifles designed to use black powder. 18 U.S.C. § 921(a)(16).