FILED
United States Court of Appeals
Tenth Circuit

December 28, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

WALTER EARL SAULSBERRY,

     Defendant - Appellant.

No. 16-6306

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:15-CR-00256-C-1)**
_____

Kyle Edward Wackenheim, Assistant Federal Public Defender, Oklahoma City, Oklahoma (William P. Earley, First Assistant Federal Public Defender, Oklahoma City, Oklahoma, on the briefs) for Defendant-Appellant.

Timothy W. Ogilvie, Assistant U.S. Attorney, Oklahoma City, Oklahoma for Plaintiff-Appellee.
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

    Defendant Walter Saulsberry pleaded guilty in the United States District Court for the Western District of Oklahoma to possession of 15 or more unauthorized credit cards with intent to defraud. *See* 18 U.S.C. § 1029(a)(3). But his plea agreement reserved his

right to appeal the district court's denial of his motion to suppress the cards seized from his car. On appeal he argues that he was unlawfully detained after an anonymous informant reported that he was smoking marijuana in his car and that the search of his car was unlawfully expanded beyond a search for marijuana to include inspection of credit cards found in a bag within the car. We have jurisdiction under 28 U.S.C. § 1291. Although we hold that there was reasonable suspicion to detain Defendant, we reverse because the arguments presented by the government do not persuade us that there was probable cause to expand the search.

## I.    BACKGROUND

About 10:30 P.M. on August 15, 2015, a dispatcher informed Sergeant Christopher Eastwood of the Oklahoma City Police Department that a caller had reported someone smoking marijuana in a black Honda with Texas license plates parked at an Arby's. Although the caller did not identify himself (for convenience we will treat the caller as a male), he said he was an employee at the Arby's.

Within two minutes of receiving this information, Eastwood drove into the Arby's parking lot. He was familiar with the location and knew the employees generally parked in the west end of the lot, where he saw several cars. There was only one vehicle on the north end, a dark green Honda with Texas license plates. Eastwood parked his vehicle behind the Honda and approached it. During his approach he noticed that Defendant was "doing something in the center console area." R., Vol. II at 12. He went up to the driver's window and tapped on it to get Defendant's attention. Defendant opened the car door, and Eastwood immediately detected the scent of burnt marijuana.

2

Eastwood asked Defendant for his license and insurance information. Defendant gave his name but did not provide the requested documentation or explain why he could not provide it. Eastwood testified at the suppression hearing that during this exchange:

> [Defendant] wasn't listening real well. He kept reaching over. There was a bag in the passenger floorboard area. He kept reaching over there, reaching in the bag, which, again, is just extremely uncomfortable for me. I mean, I don't know what's in the bag and I don't know who he is, we've never met before. So I kept telling him, just kind of keep your hands in your lap, if you would.

*Id.* at 14–15. Eastwood could not provide a description of the bag. He thought there may have been a laptop in the bag but said, "I don't even remember if it was a duffel bag or a backpack or what kind of bag it was." *Id.* at 43.

Eastwood called for assistance. After another officer arrived, Eastwood asked Defendant to step out of the Honda and requested permission to search the car. Defendant granted consent to check the vehicle for marijuana. Eastwood found a marijuana cigarette in the car's center console and arrested Defendant.

While another officer searched Defendant's person, Eastwood began a search of the car. He first looked in the bag that Defendant had been reaching into. Inside the bag Eastwood saw a stack of cards. The chronology of events is not clear from the record, so we cannot be certain when Eastwood acquired this information, but at some point (1) he determined that there were "a lot of credit cards," not a "normal amount," *id.* at 19, and (2) on the front passenger seat of Defendant's car was a device that looked similar to a machine used in credit-card fraud that he had seen in a recent investigation. Eastwood took the cards from the bag to examine them more closely. He noticed that all were

3

Capital One credit cards and none had Defendant's name on them. The officers then searched the car for further evidence of credit-card fraud.

Defendant was indicted on a single count of possession of 15 or more counterfeit or unauthorized access devices with intent to defraud. *See* 18 U.S.C. § 1029(a)(3). He moved to suppress evidence discovered during his detention at the parking lot. The district court tentatively excluded statements made by him to officers other than Eastwood but denied the rest of the motion.

## II.    DISCUSSION

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017) (brackets and internal quotation marks omitted). If the district court failed to make a specific finding in support of a ruling on an issue, we can still uphold the ruling if "there is any reasonable view of the evidence to support it." *United States v. Jenkins*, 175 F.3d 1208, 1212 (10th Cir. 1999) (district court failed to make specific findings supporting ruling that officers waited reasonable amount of time before entering home after knocking and announcing, but record supported the ruling).

We conclude that Eastwood's initial detention of Defendant in the parking lot was supported by reasonable suspicion. We believe that Eastwood would have had probable cause to examine the credit cards if before doing so he had seen the "machine" on the front seat of Defendant's car and had recognized it as a device used in credit-card fraud.

4

But the extent and timing of Eastwood's knowledge concerning the machine is unclear on this record, and neither in district court nor on appeal has the government pointed to the machine as a factor supporting probable cause.  We therefore assess probable cause without considering the machine and hold that probable cause was lacking.

### A.     Reasonable Suspicion to Initiate Traffic Stop

The parties agree that Eastwood detained Defendant in the Arby's parking lot and needed reasonable suspicion to do so.  Thus, we examine whether "specific and articulable facts and rational inferences drawn from those facts [gave] rise to a reasonable suspicion [that Defendant had committed or was] committing a crime."  *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (internal quotation marks omitted).

Reasonable suspicion in this case must be based on the report from the anonymous informant and Eastwood's observations at the scene.  As we have explained:

> Whether a tip provides reasonable suspicion to make a traffic stop is case-specific.  Although no single factor is dispositive, relevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011).  These factors support reasonable suspicion here.

To begin with, although the caller did not provide his name, he sufficiently identified himself to establish his status as a citizen informant.  "The veracity of identified private citizen informants (as opposed to paid or professional criminal

5

informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *United States v. Brown*, 496 F.3d 1070, 1075 (10th Cir. 2007) (internal quotation marks omitted); *see also id.* ("The skepticism and careful scrutiny usually found in cases involving informants from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness." (brackets, ellipsis, and internal quotation marks omitted)). As in *Chavez*, the caller identified himself as an employee of the business where Defendant parked his car. *See Chavez*, 660 F.3d at 1223 (anonymous caller was "readily identifiable" when he indicated he was an employee at a specific Wal-Mart store). By conveying information about his employment at a particular restaurant, the caller "narrow[ed] the likely class of informants" and distinguished himself from a "truly anonymous" informant who "has not placed his credibility at risk and can lie with impunity." *Florida v. J.L*, 529 U.S. 266, 275 (2000) (Kennedy, J., concurring).

In addition, the tip provided all the detail necessary to uniquely identify the suspect vehicle, the information was clearly contemporaneous and firsthand (Eastwood found the vehicle within two minutes of the dispatcher's call), the information was corroborated, and the caller's implicit motive was the public interest (at least there is no reason to believe otherwise). Defendant complains that the caller did not provide further information, such as the suspect's race, age, or clothing, or the length of time the suspect had been in the parking lot; but the caller's description narrowed the suspects to one person. All that was left was to confirm what Defendant was doing in the car. To be sure, the corroborated information is not in itself incriminatory. But that is hardly fatal.

6

The Supreme Court has held that probable cause (a higher standard than reasonable suspicion) can be based on an anonymous tip corroborated only by nonincriminatory information. *See Illinois v. Gates*, 462 U.S. 213, 243–45 (1983) (officers had sufficiently corroborated anonymous tip accusing defendants of selling drugs by observing cross-country travel patterns consistent with tip); *see also United States v. Madrid*, 713 F.3d 1251, 1261 (10th Cir. 2013) (tip adequately corroborated "[a]lthough the caller's description of the possible criminal activity . . . was not verified by the officers").

In our view, Eastwood had reasonable suspicion to detain Defendant to check out the tip. There was no need for Eastwood to postpone his investigation until he found the caller, obtained his identity, and inquired about his motivation. Eastwood was investigating the possibility of ongoing criminal activity. For him to drive to the scene in a patrol car and then enter the Arby's to investigate the caller would risk thwarting the investigation by alerting the suspect to the need to drive away, or at least to conceal any evidence.

## B. Discovery and Inspection of Credit Cards

On appeal, Defendant does not argue that a warrant was required to search his vehicle. *See United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (noting automobile exception to Fourth Amendment warrant requirement). Nor does he complain that Eastwood lacked probable cause to search the vehicle for marijuana. His complaint is that the search for marijuana did not authorize Eastwood to take the credit cards out of the bag and examine them, since he could see at once that there was no evidence in the bag relating to marijuana. He argues that Eastwood needed independent

7

probable cause to search for evidence of a credit-card offense. *See Arizona v. Hicks*, 480

U.S. 321, 323, 325 (1987) (Officer could enter apartment to investigate shots fired within

it; but it was unlawful to move stereo equipment within apartment to expose serial

number (used to determine if it was stolen) because "taking action, unrelated to the

objectives of the authorized intrusion, which exposed to view concealed portions of the

apartment or its contents, . . . produce[d] a new invasion of respondent's privacy

unjustified by the exigent circumstance that validated the entry."); *see also Minnesota v.*

*Dickerson*, 508 U.S. 366, 375 (1993) (even if an object is in an officer's plain view, the

officer cannot seize it unless its incriminating character is "immediately apparent"– that

is, the officer has probable cause to believe the object is contraband). The government

does not attempt to distinguish *Hicks* or dispute that Eastwood needed probable cause to

expand the search to include examination of the credit cards. *Cf. United States v.*

*Carbajal-Iriarte*, 586 F.3d 795, 803 (10th Cir. 2009) (officer may expand scope of

consensual search of vehicle if expansion is supported by probable cause). We therefore

review whether there was probable cause to examine the cards and conclude that there

was not.

"Probable cause to search a vehicle is established if, under the totality of the

circumstances, there is a fair probability that the car contains contraband or

evidence." *Bradford*, 423 F.3d at 1159 (internal quotation marks omitted). "Once the

officer[s]' suspicions rise to the level of probable cause, they are empowered to search

the entire vehicle, including the trunk and all containers therein that might contain

8

contraband." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (internal quotation marks omitted).

To begin with, we note that the government did not argue in district court that Eastwood's observation of the "machine" (which apparently resembled one he had recently seen in a credit-card-fraud investigation) should be considered in the probable-cause calculus. Its brief on appeal does not even mention the object. At oral argument, counsel for the government explained that he chose not to rely on the observation because of the uncertainty about whether the observation preceded the inspection of the credit cards. This omission significantly limits the evidence supporting probable cause.

What the government does rely on is the quantity of credit cards (presumably about 15) observed by Eastwood. In its view, "the sheer number of cards alone provided justification for police to examine them." Aplee. Br. at 16. There are two shortcomings in this argument – one legal and one factual. As for the legal component of the argument, the government cites several circuit opinions (all unpublished) to support its position, but the officers in those cases had significantly more evidence than just the observation of a number of credit cards. *See United States v. Alabi*, 597 F. App'x 991, 993 (10th Cir. 2015) (unpublished) (finding probable cause where officer found "a list containing the names, addresses, telephone numbers, birthdates, and social security numbers of hundreds of people; multiple laptop computers and cellular telephones; . . . more than $1,500 in Wal-Mart gift cards"; and 31 credit and debit cards, five of which were in names other than those of the occupants of the vehicle); *United States v. Reeves*, 604 F. App'x 823, 825–28 (11th Cir. 2015) (unpublished) (finding probable cause where officer

9

discovered "a laptop computer, a notebook, a plastic bag containing approximately thirty credit cards, . . . medical records[,] . . . [and] ledgers listing various names and their corresponding social[-]security numbers and dates of birth" and officer recognized from special training that these items were often used in "TurboTax fraud"); *United States v. Ahmad*, 118 F. App'x 183, 186 (9th Cir. 2004) (unpublished) (finding probable cause where officers found "bank statements, credit card statements, checks and credit cards— all in a large variety of names" (internal quotation marks omitted)).

As for the evidentiary predicate of the government's argument, it assumes that when Eastwood looked in the bag he saw a number of *credit* cards. But the record does not support an inference that Eastwood could tell that the cards in the bag were credit cards. Although he testified that what he found when he looked in the bag was "a lot of credit cards," App. Vol. II at 19, his next comment was that the thing that was unusual about that was that "[n]one of them belonged to him," *id.* – an observation that undoubtedly had to await his examination of the cards. He was clearly testifying about what he ultimately found, not what he saw upon opening the bag. And Eastwood later repeatedly testified that what he saw was a "stack" of cards. *See, e.g., id.* at 19-20, 35. Even if the top of the stack – the card visible to Eastwood – was a credit card, he would need to examine the stack to determine that the other cards were also credit cards, rather than membership cards, library cards, gift cards, insurance cards, or the like. It would not be uncommon for someone to have 15 plastic, wallet-sized cards. Further supporting this inference is that Eastwood acknowledged on cross-examination that "it was only after [he] pulled [the cards] out of the bag, examined them, that [he] felt that there was

10

something . . . shady or something like that." *Id.* at 42. The government has failed to explain how Eastwood could have known that all the cards in the stack were credit cards before he handled them.

In our view, a police officer's observation that a suspect possesses a number of cards (about 15) does not provide probable cause to believe that the suspect has been or is committing a crime. And we know of no authority to the contrary.

Defendant's suspicious movements toward the bag while Eastwood was questioning him are not sufficiently probative to raise the evidence to the level of probable cause. Even in hindsight it is hard to explain Defendant's reaching for the bag, particularly since there was no gun there, as Eastwood could immediately tell upon looking in the bag. We find it hard to come up with a chain of inference that begins with Defendant's reaching into the bag and ends with the conclusion that the cards must be involved in criminal activity. Perhaps one can view the reaching as a nervous (and foolish) reaction by a criminal who simply cannot restrain himself from pointing to the evidence of his own guilt. But this court, recognizing the stress inherent in any interaction with law enforcement and the ambiguity of nervous reactions, has consistently expressed concern about giving too much weight to nervous behavior in assessing probable cause. *See, e.g., United States v. Lopez,* 849 F.3d 921, 925-26 (10th Cir. 2017). Such behavior is certainly a factor to be considered, but it cannot do the job that would be necessary to establish probable cause here.[1]

---

[1] In ruling that there was "sufficient reasonable suspicion to support the officers' closer examination of the credit cards found in the bag," Aplt. App., Vol. I at 36, the district

11

In short, we hold that the government did not establish probable cause justifying Eastwood's examination of the cards. Evidence obtained from that examination must be suppressed.

### III.    CONCLUSION

We **REVERSE** the denial of Defendant's motion to suppress and remand for further proceedings.

---

court relied in part on the fact that the search of Defendant incident to his arrest uncovered in his pocket a credit card with a woman's name on it. On appeal the government does not rely on the discovery of that card, acknowledging that there is no evidence that Eastwood knew about this discovery when he searched the cards in the bag. Nor does the government rely on any collective-knowledge argument in which the knowledge of one officer is imputed to another. *See generally United States v. Chavez,* 534 F.3d 1338, 1345 &  n.12 (10th Cir. 2008) (discussing horizontal and vertical collective knowledge).

We also note that the government does not argue that Eastwood was justified in examining the cards to confirm Defendant's identity, given that Defendant had provided no identification document. We express no view on the matter.