FILED
**United States Court of Appeals**
**Tenth Circuit**

**January 12, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KEVAS L. BALLANCE,

    Defendant - Appellant.

No. 20-3141
(D.C. No. 6:19-CR-10023-JWB-2)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **MORITZ**, and **EID**, Circuit Judges.
_____

Kevas Ballance appeals an order denying his motion to suppress counterfeit bills that law enforcement discovered during an investigative stop. Ballance argues that the officer who initiated the stop lacked reasonable suspicion and did not obtain voluntary consent to search Ballance's pockets. Neither argument merits reversal, so we affirm for the reasons explained below.

**Background**

The events leading to Ballance's arrest began with a 911 call from an unnamed employee at Hibbett Sports in Newton, Kansas. The government did not produce the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

audio or a transcript of the 911 call at the suppression hearing, but two Newton police officers described a dispatch transmission relaying the call's contents.[1]

According to Officer Charles Shell, dispatch said that the employee had reported a person leaving the store about five minutes earlier who "matched the description of somebody [who] had previously passed some counterfeit money" at a Hibbett Sports. R. vol. 3, 12. At the time, Shell did not know when the prior counterfeiting incident had occurred. But Officer Luke Winslow, who also heard the dispatch transmission, believed the incident had occurred "recently" at a Hibbett Sports in a neighboring city. *Id.* at 44. Dispatch also told Shell that the caller identified the customer as "a black male wearing [a] white shirt and blue jeans," adding that he drove off heading north on Main Street in a black Nissan Armada with a particular license-plate number. *Id.* at 13.

Responding to the dispatch report, Shell headed south on Main Street toward Hibbett Sports. On the way, he spotted a car matching the caller's description at a gas station two blocks north of the store. Shell pulled in behind the car at a gas pump, confirmed that the car had the same license-plate number as the one the caller provided, and radioed for backup. Two black men wearing white T-shirts exited the vehicle; the driver wore either "jeans or black pants," and the passenger wore blue jeans. *Id.* at 30. The passenger, later identified as Ballance, walked past Shell's patrol

---

[1] Ballance disputes certain aspects of the officers' testimony about what the call said, and our brief account of their testimony here is not meant to resolve that dispute, which we address later.

2

car and into the gas station.

Shell then approached the black Nissan on foot to speak with the driver, Joseph Richard, Jr., who stood next to the vehicle's driver's side. During the ensuing conversation, Richard confirmed that he and Ballance had just been to Hibbett Sports but denied buying anything. When asked about two shoeboxes in a Hibbett Sports sack behind the driver's seat, which Shell had observed as Richard opened the rear driver-side door to retrieve his ID, Richard clarified that the items had been bought the day before. At some point, the conversation migrated to the other side of the car, where Richard stood within the open passenger door frame—and later sat in the passenger's seat with the door open—answering several identification questions about himself and Ballance.[2] Richard wanted to know why Shell was asking him these questions, so Shell explained that "they believe that you guys may be passing some fraudulent bills over at Hibbett Sports." Supp. R. vol. 1, 4.

As Shell supplied this explanation, Winslow arrived at the scene and came to stand near Shell on the passenger side of Richard's vehicle. At that time, Winslow's understanding was in part that the customer reported by the caller had "attempt[ed] to return some athletic shoes that had been purchased at a different Hibbett Sports in a different city." R. vol. 3, 44. Winslow had also heard dispatch say that the caller "felt [the customer] had been involved in similar fraudulent activity at a Hibbetts in a

---

[2] It is unclear how Shell and Richard ended up on the other side of the car or how much time passed between the driver- and passenger-side conversations; Shell's bodycam footage simply cuts from one side of the car to the other.

neighboring city." *Id.* at 41. Shell said something along those lines to Richard just after Winslow arrived, explaining that someone at the store thought Richard or Ballance "match[ed] the description" of someone who "passed bills at other local stores." Supp. R. vol. 1, 4.

Sometime later, Winslow took a turn asking Richard questions. As before, Richard said that he and Ballance had just been to Hibbett Sports. This time, however, Richard added that only Ballance went inside the store and that he did so "to return some stuff but they said he couldn't return the stuff." *Id.* at 5. About thirty seconds later, Shell interrupted the questioning to note that Ballance was walking away from the gas station and was "gonna leave [Richard] out to hang." *Id.* Just before Winslow left in his patrol car to stop Ballance, Richard suggested that the officers "call [Ballance] down here to see if someone passed a fake bill."[3] *Id.*

Winslow drove around the parking lot to where Ballance was walking on a sidewalk and asked him to "[c]ome here and talk to me." *Id.* at 7. Ballance complied. After patting Ballance down for weapons and requesting an ID, Winslow questioned Ballance about why he was "trying to get away from that scene." *Id.* In the exchange

---

[3] Ballance notes that Richard actually said to "call *him* down here," not using Ballance's name, and that Winslow was unsure, in his testimony at the suppression hearing, whether the "him" Richard referred to was Ballance or an employee at Hibbett Sports. Supp. R. vol. 1, 5 (emphasis added). But the district court found that Richard was referring to Ballance, and Richard's statement can be read to support that finding. Because we view the evidence in the light most favorable to the district court's decision in an appeal from the denial of a suppression motion, we presume that Richard was referring to Ballance. *See United States v. Juszczyk*, 844 F.3d 1213, 1214 (10th Cir. 2017).

that followed, Winslow peppered Ballance with questions about his explanation that he was on his way to the liquor store, pointing out that there was no liquor store in the direction he was headed and that he could have driven to the liquor store after Richard got gas.

When Winslow eventually asked what Ballance and Richard had been doing that day, Ballance said he had tried to return some shoes for his cousin but could not do so because his ID did not have an address on it. Ballance complied with Winslow's request to see the bills in Ballance's wallet, and Winslow found only legitimate bills inside. While Winslow questioned Ballance about why the store employee would say that he "pass[ed] fake bills," Ballance reached for his pockets. *Id.* at 12. After ordering Ballance not to reach for his pockets, Winslow said: "You mind if I look, make sure you got nothing in your pockets?" *Id.* "Go ahead," Ballance replied. *Id.* Winslow found a counterfeit $50 bill in one of Ballance's pockets and then arrested him. During booking at the county jail, officers found more counterfeit bills in Ballance's shoes.

Based on these events, a federal grand jury charged Ballance with (1) one count of conspiracy to manufacture, possess, or pass counterfeit money and (2) eight counts of possessing or passing counterfeit money. Ballance moved to suppress the counterfeit bills found in his pocket and shoes, arguing that they were fruits of an unlawful seizure and search in violation of the Fourth Amendment. At a hearing on the motion, the government presented testimony from Shell and Winslow, bodycam footage from both officers, and transcripts of the bodycam footage. The district court

later denied Ballance's motion, determining that Winslow had reasonable suspicion to stop Ballance and that Ballance voluntarily consented to a search of his pockets.

Ballance ultimately entered a conditional guilty plea to conspiracy to possess or pass counterfeit money, reserving his right to appeal the order denying his suppression motion. This appeal followed.

## Analysis

When reviewing an order denying a motion to suppress, we view the evidence in the light most favorable to the district court's ruling, accept the district court's factual findings unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment.[4] *See Juszczyk*, 844 F.3d at 1214. A finding is clearly erroneous "if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017) (quoting *In re Vaughn*, 765 F.3d 1174, 1180 (10th Cir. 2014)). Ballance offers two reasons the district court should have granted his suppression motion, which we consider

---

[4] Ballance asks that we "reconsider [our] practice" of viewing the evidence in the light most favorable to the government when reviewing an order denying a defendant's suppression motion. Aplt. Br. 21. But as Ballance acknowledges, we "recently refused to overrule this line of precedent" because "only the en banc [c]ourt could do so." *Id.* at 23; *see also United States v. Berg*, 956 F.3d 1213, 1216 n.3 (10th Cir.), *cert. denied* 141 S. Ct. 605 (2020). And even more recently, this court again declined to abandon this approach, specifically rejecting the argument Ballance raises: that the Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690 (1996), forbids appellate courts from viewing the evidence in the light most favorable to the government when the district court rules in its favor. *See United States v. Torres*, 987 F.3d 893, 900–01 (10th Cir. 2021). We therefore reject Ballance's argument here, as well.

in turn: (1) Winslow lacked reasonable suspicion to stop Ballance, and (2) Ballance did

not voluntarily consent to a search of his pockets.

## I.    Reasonable Suspicion

Ballance first challenges the district court's determination that Winslow had

reasonable suspicion to initiate an investigative stop. If an officer lacks such suspicion

when a stop begins, the stop is an unreasonable seizure under the Fourth Amendment. *See*

*United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018); *United States v.*

*Whitley*, 680 F.3d 1227, 1232–33 (10th Cir. 2012). The parties here agree that the stop

began when Ballance complied with Winslow's command to "[c]ome here and talk to

me, bud" and started answering Winslow's questions. Supp. R. vol. 1, 7; *see also United*

*States v. Gaines*, 918 F.3d 793, 799 (10th Cir. 2019) (concluding that seizure began

when defendant "yielded to [a] show of authority" by "getting out of his car,

answering the officer's questions, and looking for his identification"). So to resolve

Ballance's argument, we must assess whether "the facts available to [Winslow] at

th[at] time" amounted to reasonable suspicion.[5] *Whitley*, 680 F.3d at 1234 (quoting

*United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011)).

Reasonable suspicion exists if, considering the totality of the circumstances, the

detaining officer has "a particularized and objective basis" for suspecting a person's

---

[5] For this reason, the district court improperly relied on information Winslow learned *after* stopping Ballance, such as Ballance's explanation "that he had decided to walk to a non[]existent liquor store rather than return to the vehicle." R. vol. 1, 47. We do not consider any post-stop facts in our reasonable-suspicion analysis, focusing instead on what Winslow knew at the stop's inception. *See Whitley*, 680 F.3d at 1232, 1234.

involvement in criminal activity. *Martinez*, 910 F.3d at 1313 (quoting *United States v. Pettit*, 785 F.3d 1374, 1379–80 (10th Cir. 2015)). Under this standard, the officer "'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." *Id.* (quoting *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009)). That said, the objective basis for the stop must be "something more than an inchoate and unparticularized suspicion or hunch." *Id.* (quoting *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015)).

The district court determined that Winslow had an objective basis to suspect Ballance's involvement in counterfeiting activity. It based this determination on "the 911 call, the corroborated facts by Richard, and [Ballance's] actions in attempting to flee" by walking away from the gas station. R. vol. 1, 46. Ballance attacks those circumstances individually to show that they do not establish reasonable suspicion, mostly focusing on the 911 call.

Ballance's primary argument involves the district court's factual finding about what information the 911 call contained. Citing Winslow's testimony, the district court found that the caller "reported that the suspect was returning athletic shoes that had been purchased with counterfeit currency and that the suspect had been involved in this fraudulent conduct at a Hibbett Sports store in a neighboring city." R. vol. 1, 40. Ballance contends that this finding is clearly erroneous, mainly because (in his view) Winslow gave conflicting testimony on whether the caller said that "the person in the store tried to return shoes that had been purchased with counterfeit currency." Aplt. Br. 28. Without evidence showing that the customer tried to return such items, Ballance says, the 911 call

8

lacks sufficient detail of criminal activity to support reasonable suspicion.

The alleged conflict in Winslow's testimony comes from statements he made on direct examination about his memory of the 911 call, as relayed by the dispatch transmission. In response to a leading question from the government, Winslow answered in the affirmative when asked if he knew, upon arriving at the gas station, "that the suspect was attempting to return some athletic shoes that had been purchased at a different Hibbett Sports in a different city." R. vol. 3, 44. According to Ballance, Winslow later contradicted this answer by "testif[ying] that he did not recall if he got this information from the dispatch report." Aplt. Br. 30. For support, Ballance cites this exchange from Winslow's direct examination:

> [Q.] [W]as it your understanding . . . that the suspect was attempting to return athletic shoes that had been purchased with counterfeit currency?
>
> A. That was my understanding at some point[.] I don't remember if I got that information directly from the dispatched call or not.
>
> Q. Pardon?
>
> A. I don't remember . . . if I got that information directly from the dispatch call or not but I know that by the time I went to contact [Ballance] that was part of my understanding.
>
> Q. So when you contacted him, . . . you believed and knew . . . that somebody had tried to return shoes at Hibbett Sports that had been purchased with counterfeit currency?
>
> A. Yes.

R. vol. 3, 52–53.

Viewing the evidence in the light most favorable to the district court's ruling, we see no clear error by the district court. Winslow did not retract his earlier agreement with

9

the statement that dispatch said the suspect had tried to return shoes bought with counterfeit currency, nor did he testify that dispatch did *not* provide that information. Instead, Winslow simply expressed uncertainty about the source of his knowledge, suggesting that he could have obtained the information from either dispatch or his investigation at the scene before stopping Ballance. Because Winslow did not rule out the possibility that dispatch was the true source of his knowledge, the district court could reasonably accept his initial statement and find that dispatch relayed the information.

That is not to say that the district court was required to credit the initial statement. It could have read Winslow's later statement as conflicting with his initial one (as Ballance does), and that may have been a reasonable reading given Winslow's conduct at the scene. But when "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). Because there is a plausible way to avoid the conflict Ballance perceives in Winslow's testimony, that testimony supports the district court's finding that the caller reported an attempted return of items purchased with counterfeit currency. Thus, the district court's finding on this point was not clearly erroneous.[6] *See Hernandez*, 847 F.3d

---

[6] Ballance also argues that the district court made "somewhat contradictory findings" by crediting (1) Winslow's testimony about an attempted return of an item purchased with counterfeit currency, and (2) Winslow's and Shell's testimony that the caller said the customer matched the description of someone who previously used counterfeit bills at another Hibbett Sports. Aplt. Br. 28. We reject this argument because both findings can be true; the caller may have reported that the customer tried to return an item and that the customer matched the description of the suspect from the prior incident.

at 1263.

Next, Ballance argues that the 911 call does not establish reasonable suspicion because it provides insufficient information linking Ballance to criminal activity. This argument involves the factors we apply to determine whether an anonymous tip supports reasonable suspicion. Those factors include whether the tipster was truly anonymous, "reported contemporaneous, firsthand knowledge," and "provided detailed information about the events observed," as well as the tipster's "stated motivation for reporting the information" and "whether the police were able to corroborate information provided by the informant." *United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011); *see also Navarette v. California*, 572 U.S. 393, 399 (2014) (applying similar factors). Ballance maintains that several of these factors are "completely absent" here. Aplt. Br. 32–33. Specifically, he argues that the caller reported only a conclusory allegation based on secondhand information that a customer was involved in a prior counterfeiting incident at another store, and that the officers corroborated only innocent details showing that he was the person the caller observed in the Newton store.

On the firsthand-knowledge factor, Ballance presumes that the only relevant criminal activity is the prior counterfeiting incident. Were that the case, we would have no trouble concluding that the caller supplied only secondhand knowledge because, as Ballance notes, the caller did not suggest that he or she observed the prior incident at the other store and linked Ballance to the incident based solely on a description provided by someone else who did. But the prior incident is not the only criminal activity the caller reported. As we have explained, Winslow's testimony

11

supports the district court's finding that the caller said someone tried to return property previously purchased with counterfeit bills. This attempted fraudulent return at the Newton store is a distinct crime apart from the purchase at the other store, and the 911 call provided "contemporaneous, firsthand knowledge" of that crime from an employee at the Newton store.[7] *Chavez*, 660 F.3d at 1222.

To be sure, the caller omitted some details about the attempted fraudulent return. The caller did not say, for instance, how he or she knew that the items being returned had been bought with counterfeit bills. But in any event, the caller's reliability overcomes any deficiency in the dearth of details the caller supplied. Because the caller provided identifiable employment information, Winslow could discover the caller's identity and obtain the missing details through further investigation. *See Chavez*, 660 F.3d at 1222 (finding caller not truly anonymous because "he told [dispatchers] he was a Wal-Mart employee at a specific Wal-Mart store and thereby provided the police with information to discover his identity"). This possibility boosts the reliability of the caller's information because it "provides a disincentive for making false allegations." *United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002). The lack of evidence

---

[7] We recognize that the district court's analysis on this factor differs somewhat from our own. The district court reasoned that although "the employee was reporting contemporaneous, firsthand knowledge regarding the suspect's actions at the Newton store," the employee was nevertheless "likely not relaying firsthand knowledge of the suspected criminal activity." R. vol. 1, 43. But because the attempted fraudulent return was itself a crime, we base our analysis of this factor instead on the alternative ground that the employee reported a firsthand account of criminal activity in the Newton store. *See United States v. Price*, 75 F.3d 1440, 1444 (10th Cir. 1996) (explaining that we may "uphold the denial of a motion to suppress on any ground supported by the record").

suggesting that the caller had any reason to fabricate the report also enhances the caller's reliability. *See United States v. Saulsberry*, 878 F.3d 946, 950 (10th Cir. 2017) (stating that "caller's implicit motive was the public interest" because "there [was] no reason to believe otherwise").

In addition, Winslow corroborated some details from the call during his conversation with Richard at the gas station before stopping Ballance. Most importantly, Richard confirmed not only that Ballance had just been to the Newton Hibbett Sports, but also that Ballance went inside alone to "return some stuff but they said he couldn't return the stuff."[8] Supp. R. vol. 1, 5. This statement tracked the caller's statement that a person matching Ballance's description had tried to return items. That Richard said the store would not accept the return provided Winslow with even more reason to believe the caller's report that those items had been bought with counterfeit bills.

Altogether, the anonymous-tip factors discussed above support reasonable suspicion. Based on Winslow's testimony, the caller observed someone trying to return merchandise that the store knew had been bought recently using counterfeit bills. When questioning Richard, Winslow confirmed that Ballance had just been in the store to return some items and that the store would not allow him to do so. And because the caller identified themselves as an employee at a specific store, Winslow

---

[8] Ballance stresses that this statement shows he "had been in the Newton store" but does not "connect[] [him] to the previous counterfeiting incident." Aplt. Br. 35. But again, the attempted return in the Newton store was itself criminal activity, and Richard's statement certainly connected Ballance to that activity.

could follow up with the caller and confirm details missing from the call, such as how the store knew that the purchaser had used counterfeit bills. For these reasons, the 911 call gave Winslow at least *some* reason to suspect Ballance's involvement in criminal activity.

And once Winslow arrived at the gas station, he learned two new facts that heightened this suspicion. First, Winslow heard Richard deflect blame onto Ballance. When Shell noted Ballance walking away from the gas station and Winslow asked which officer should "run [Ballance] down," Richard said the officers should "call [Ballance] down here to see if someone passed a fake bill." Supp. R. vol. 1, 5. Richard's statement adds more support for reasonable suspicion because, as the district court found, "rather than outright denying any involvement in counterfeit currency," he "deflected the officer's inquiry" about counterfeiting and directed it at Ballance. R. vol. 1, 46.

Second, the officers observed Ballance walking away from the gas station on foot. The district court determined that this fact supported reasonable suspicion because it constitutes "[u]nprovoked flight upon noticing the police." *Id.* (quoting *United States v. Carroll*, 491 F. App'x 900, 903 (10th Cir. 2012) (unpublished)). Ballance questions the district court's reliance on so-called "flight" cases because here no evidence suggests that his "walking away from [the] gas station on foot was 'headlong' or 'unprovoked.'" Aplt. Br. 38 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)). Yet this argument fails because even if Ballance's conduct does not constitute "flight," it nevertheless constitutes suspicious behavior. We have said that both

14

"unprovoked flight *and* other evasive behavior upon noticing police officers" may be "pertinent factor[s] in determining reasonable suspicion." *United States v. Madrid*, 713 F.3d 1251, 1257 (10th Cir. 2013) (emphasis added). And any number of circumstances besides outright flight may "reasonably suggest evasion," including "[a] sudden change of direction upon seeing law enforcement, increased speed in an apparent attempt to create distance from the officers, and repeated glances over one's shoulder." *United States v. Briggs*, 720 F.3d 1281, 1287 (10th Cir. 2013). Here, the district court reasonably found Ballance's behavior evasive because rather than return to Richard's car, Ballance walked away from the gas station on foot. "Although not 'of ironclad significance,'" this evasive behavior was another circumstance supporting reasonable suspicion, and the district court did not err in treating it as such.[9] *Id.* at 1286 (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)).

Thus, considering all the facts known to Winslow when the stop occurred, he had "a particularized and objective basis" for suspecting Ballance's involvement in criminal activity. *Martinez*, 910 F.3d at 1313 (quoting *Pettit*, 785 F.3d at 1379–80). The 911 call generated some suspicion that the customer who left the store had tried to return goods bought with counterfeit bills. And after arriving at a nearby gas station where another officer had located that customer's vehicle using a description and license-plate number

---

[9] It did err, however, in noting that Ballance "avoided eye contact with [Shell]" when walking into the gas station. R. vol. 1, 3, 46. Winslow had not arrived yet when this occurred, and no evidence shows that he knew about it before stopping Ballance. Accordingly, we do not consider this fact in our analysis. *See Whitley*, 680 F.3d at 1234 (assessing reasonable suspicion based on "facts available to the *detaining* officer" (emphasis added) (quoting *McHugh*, 639 F.3d at 1256)).

provided by the caller, Winslow received confirmation from Richard that Ballance had just been inside the store and tried to return items. These facts, along with Richard's deflection and Ballance's evasive conduct, provided the "minimal level of objective justification" needed to stop Ballance. *Martinez*, 910 F.3d at 1313 (quoting *Winder*, 557 F.3d at 1134). In sum, the district court did not err in determining that Winslow had reasonable suspicion.

## II.    Voluntary Consent

Ballance also challenges the district court's finding that he voluntarily consented to a search of his pockets. Whether consent is voluntary is a fact question reviewed for clear error on appeal. *United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018). As we have noted, a factual finding is clearly erroneous "if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *Hernandez*, 847 F.3d at 1263 (quoting *In re Vaughn*, 765 F.3d at 1180).

When, as here, an officer conducts a warrantless search, it is "presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." *Latorre*, 893 F.3d at 756 (quoting *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011)). The government invokes the consent exception, which applies when a person (1) either expressly or impliedly consents to a search and (2) does so freely and voluntarily. *Id.* Ballance challenges the second element, arguing that his consent was involuntary.

Whether consent is voluntary, rather than "the product of duress or coercion,"

depends on the totality of the circumstances. *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (quoting *Harrison*, 639 F.3d at 1278). Those circumstances include

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant [the] *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider.

*Id.* (quoting *Harrison*, 639 F.3d at 1278). Citing these factors, Ballance argues that his consent was involuntary because (1) Winslow used an aggressive tone and accusatory approach in questioning Ballance; (2) Winslow was in uniform and wearing a utility belt with a firearm; (3) Ballance was detained when the search occurred; (4) Winslow patted Ballance down and held onto his identification card; and (5) Winslow did not inform Ballance of his right to refuse consent.

Other factors, however, support the district court's contrary finding. Having "reviewed the video of the interaction between [Ballance] and Winslow," the district court viewed Winslow's tone as "firm and direct" but "not aggressive." R. vol. 1, 48. It also noted that although Winslow wore a uniform and carried a gun, "the weapon was holstered." *Id.* Plus, because Shell remained at the gas pump with Richard, "only one officer was present during the interaction." *Id.* It is true that Ballance was detained when Winslow requested consent, but detention is only one of several factors in the voluntariness analysis; a person "may voluntarily consent to a search even though he is detained." *Latorre*, 893 F.3d at 756 (quoting *United States v. Davis*, 636 F.3d 1281, 1293 (10th Cir. 2011)). And notably, nothing "indicat[es] that [Ballance] was coerced,

17

threatened, made promises, or tricked." R. vol. 1, 48. Ballance emphasizes Winslow's "persistent accusatory questioning." Rep. Br. 11. But considering the totality of the circumstances, we can't say "that a reasonable person would have been so adversely impacted by" such questioning "that he or she would have involuntarily consented to a search." *Jones*, 701 F.3d at 1319. Thus, the district court did not clearly err when it found that Ballance voluntarily consented to a search of his pockets.

## Conclusion

The district court properly determined both that Winslow had reasonable suspicion to stop Ballance and that Ballance voluntarily consented to a search of his pockets. Accordingly, we affirm the district court's order denying Ballance's motion to suppress.

Entered for the Court

Nancy L. Moritz
Circuit Judge