**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellant,

v.

CAROL HAWLEY,

        Defendant – Appellee.

No. 16-1000
(D.C. No. 1:14-CR-00204-RM-3)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.

A jury convicted Carol Hawley of conspiracy to possess 50 grams or more of

methamphetamine and possession of 50 grams or more of methamphetamine.  *See* 21

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.

    This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished).  *Id.*

U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846. She was sentenced to 240 months imprisonment. She wants us to reverse the convictions because, in her view, both her motions to suppress and for a mistrial should have been granted. We see no error and affirm.

## I. Motion to Suppress

*A. Background*

In 2012, Arapahoe County Sherriff's Officer Kelly Draper was assigned to the FBI's gang task force. As part of that assignment, he led the investigation of Debbi Martinez, a methamphetamine distributor in Denver, Colorado. He obtained a wiretap for her telephone. In early March 2013, he intercepted several telephone conversations between Martinez and Hawley indicating Hawley redistributed drugs for Martinez.

On March 12, 2013, Draper intercepted a telephone conversation between Martinez and Hawley wherein they discussed Hawley traveling to Fort Collins to deliver methamphetamine. Later that evening, task force agents observed Hawley engage in a hand-to-hand drug transaction with John Smith, a known Martinez drug associate. Later, Martinez called Smith who informed her that he had given Hawley "a half of a zip," meaning "a half of an ounce." (R. Vol. I at 96.) Martinez told Smith that was the wrong amount; Hawley needed half a pound because "she needs to trip with it." (*Id.* at 97.) Shortly after that telephone conversation, officers observed Hawley leave Martinez's residence with Kintessa Ernest. Hawley, who was driving, proceeded to Smith's residence where agents observed her in another hand-to-hand drug transaction with

Smith.

After Hawley left Smith's residence, surveillance agents observed her engage in several "burn runs," driving maneuvers designed to determine whether one is being followed by the police. (*Id.* at 98.) Draper directed a member of his surveillance team to request a "wall stop" of Hawley's vehicle by the local police.[1] (*Id.* at 105.) The surveillance agent did so, describing Hawley's vehicle and stating "he believed it was a load car, [with a] significant amount of drugs in it." (*Id.* at 122.)

Within minutes, Jeff Meyer, a City of Denver patrol officer, responded to the request. He followed Hawley's vehicle and observed it make a wide sweeping left turn onto the shoulder of a road before returning to the road. Based on that turn, Meyer believed the driver was under the influence of drugs or alcohol (DUI) and initiated a traffic stop.[2] At about the same time, Draper dispatched a canine officer to the scene.

Meyer approached Hawley and asked for her driver's license and vehicle registration. She did not respond with the requested items, but instead produced a

---

[1] A "wall stop" is motivated by investigating officers' belief that the vehicle contains contraband. Critically, however, the stopping officer must have reasonable suspicion for the stop (quite apart from the information provided by the investigating officers), for instance, the observation of a traffic violation. The purpose is to place a "wall" between the stopping officer and the investigating officers so as not to jeopardize the secrecy of an ongoing investigation. Such stops are valid law enforcement tactics designed to ensure a stopping officer's safety (fear of reprisal should the suspects know the real reason behind the stop) and the continued integrity of an underlying investigation. *United States v. Chavez*, 534 F.3d 1338, 1348 (10th Cir. 2008).

[2] According to Meyer's testimony, his experience has revealed wide-sweeping turns to be a strong indication of a driver being under the influence of drugs or alcohol.

Department of Corrections identification card. Six minutes after stopping the vehicle and upon his suspicion of a DUI, Meyer requested the assistance of a Drug Recognition Expert (DRE) to determine whether Hawley was under the influence of drugs or alcohol.[3]

While Meyer was waiting for the DRE, canine officer Gordon Carroll arrived on scene. He walked his certified drug dog around the exterior of Hawley's vehicle. The dog alerted to the passenger side front door. He then placed the dog inside the vehicle, where it again alerted, this time to the passenger front floorboard and the back of the center console. Officer Carroll searched the vehicle, finding 226 grams of methamphetamine.[4]

Hawley was indicted with conspiracy to possess and possession of 50 grams or more of methamphetamine. She moved to suppress the drugs, arguing the initial stop and subsequent search of her vehicle were invalid under the Fourth Amendment.

The judge denied the motion. He concluded the initial stop of Hawley's vehicle was proper because Meyer reasonably suspected her of driving under the influence of drugs or alcohol based on the wide left turn. He also decided the search of her vehicle was valid for either of two reasons. First, the task force had probable cause to believe the vehicle contained drugs based on the information it had obtained through surveillance

---

[3] Meyer requested a DRE because he was not formally trained to determine whether a driver is under the influence of alcohol or drugs.

[4] The DRE performed the necessary tests on Hawley. He ultimately determined probable cause to arrest her for a DUI was lacking. She was arrested, however, for the drugs found in her vehicle.

and the wiretap of Martinez's telephone. Second, there was probable cause to search the vehicle based on the drug dog's alert. And, because the dog alerted to the vehicle prior to the DRE arriving on scene, there was no undue delay because the purpose of the stop—to investigate whether Hawley was driving under the influence—had not yet concluded.

*B. Discussion*

When reviewing the denial of a motion to suppress evidence, "[w]e view the evidence in the light most favorable to the Government and accept the court's factual findings unless clearly erroneous." *United States v. Stephenson*, 452 F.3d 1173, 1176 (10th Cir. 2006). We review de novo the ultimate determination of reasonableness under the Fourth Amendment. *Id.*

1. Traffic Stop

"A traffic stop is a seizure under the Fourth Amendment and must be objectively reasonable to pass constitutional muster." *United States v. Lyons*, 510 F.3d 1225, 1234 (10th Cir. 2007). "[It] is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) (quotation marks omitted).

Hawley concedes the initial stop of her vehicle was valid, whether based on the illegal turn or Officer Meyer's reasonable suspicion of DUI. *See Lyons*, 510 F.3d at 1234 ("A traffic stop is valid at its inception if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.") (quotation marks omitted). Her concession

effectively abandons her contrary argument made in the district court.

But, even apart from the traffic violation, the stop of Hawley's vehicle was justified. "[T]he lawfulness of [a traffic stop] is not limited to situations where an officer suspects a traffic or equipment violation"; "[s]uch a stop is [also] justified if the officer bears a reasonable suspicion that criminal activity may be afoot." *See United States v. Whitley*, 680 F.3d 1227, 1232-33 (10th Cir. 2012) (quotation marks omitted). To determine whether reasonable suspicions exists, we consider "the totality of the circumstances" and ask whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

That standard is easily satisfied here. Based on the information obtained from the wiretap and surveillance, Officer Draper knew (1) Martinez was a methamphetamine distributor, (2) Hawley conversed with Martinez about traveling to Fort Collins to deliver methamphetamine, (3) Hawley subsequently engaged in a hand-to-hand drug transaction with Martinez's known source of supply, Smith, (4) Martinez informed Smith that he had provided Hawley the wrong amount of drugs (half a pound was needed, not a half of an ounce), (5) Hawley thereafter engaged in a second hand-to-hand drug-transaction with Smith; and (6) after meeting with Smith, Hawley engaged in a number of "burn runs." Draper and his team reasonably suspected Hawley of illegally transporting a half a pound

of methamphetamine.[5]

Hawley focuses on the "collective knowledge" or "fellow officer" rule, arguing

Meyer could not rely on the information Draper or the task force gleaned from the

wiretap and surveillance because it was never conveyed to him.  Meyer was told only that

the dispatching officer "believed [Hawley's vehicle] was a load car [with a] significant

amount of drugs in it."[6]  (R. Vol. 1 at 122.)

> But the "fellow officer" rule has both a "vertical" and "horizontal" component:
>
> Vertical collective knowledge exists if one officer *actually* has probable cause and instructs another officer to act without communicating the information he knows that would justify the action.  Horizontal collective knowledge, in contrast, exists when many officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause.  In the latter situation, courts may consider whether officers who are acting together *collectively* possess sufficient information to support probable cause, provided that they have actually communicated the information to each other.

*See Felders ex rel. Smedley v. Malcolm*, 755 F.3d 870, 881 (10th Cir. 2014) (citations and

quotation marks omitted).  This case implicates vertical collective knowledge—one

officer, Draper, has reasonable suspicion of criminal activity and instructs another officer,

---

[5] Hawley claims Officer Draper and the task force never saw her with drugs and instead relied on telephone conversations she had with Martinez which never mentioned drugs.  But the surveillance officers twice observed her in a hand-to-hand drug transaction with Smith.  And, while the telephone conversations never mentioned the word "drugs" or "methamphetamine," Officer Draper testified that most drug-traffickers regularly speak in "coded language," as was done in this case.  (R. Vol. 1 at 88.)

[6] Hawley's brief is difficult to follow.  She makes this argument in challenging whether there was probable cause to search the vehicle.  But it only makes sense if applied to the initial stop of her vehicle.  That is because Meyer was involved only in the initial stop.  Officer Carroll, not Meyer, searched the vehicle.  Yet, she conceded the initial stop was valid based on Meyer's observed traffic violation.

Meyer, to act. *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). In such circumstances, there was no need for Draper to have communicated specific information to Meyer. *See Whitley*, 680 F.3d at 1234 ("Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action"; "[t]hus, an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, *so long as the communicating officer has reasonable suspicion to make the stop himself.*") (emphasis added); *see also United States v. Hensley*, 469 U.S. 221, 230, 233 (1985) (stop of person by officers of one police department based on a "wanted flyer" issued by another police department was valid even though the flyer itself did not provide sufficient information to justify the stop but the officers who issued the flyer had reasonable suspicion the wanted person had committed an offense); *United States v. Wilkinson*, 633 F.3d 938, 943 (10th Cir. 2011) (one officer's stop of defendant's vehicle upon the request of a second officer was permissible because the second officer had reasonable suspicion of an equipment violation).

The reasons for the "fellow officer" rule are obvious. Police officers do not often have the luxury of time and should be able to reasonably rely on the information provided by other officers without having to "cross-examine [them] about the foundation for the transmitted information." *Hensley*, 469 U.S. at 231 (quotation marks omitted). The public benefits as well when police officers are allowed to efficiently perform their

- 8 -

duties.  At the same time, "the intrusion on [a defendant's] personal security is minimal"—"[l]ittle, if any, additional individual freedom would result from requiring officers to set forth their grounds for reasonable suspicion or probable cause in their communications with other officers."  *Wilkinson*, 633 F.3d at 942 (quotation marks omitted); *see also Hensley*, 469 U.S. at 232.  Moreover, defendants, like Hawley, still have the opportunity to challenge the claimed reasonable suspicion under the Fourth Amendment but must properly direct their challenges.  Hawley tried and failed.

## 2. Probable Cause to Search

Hawley complains probable cause to search her vehicle was wanting.  She is mistaken.  Like the district judge, we see more than ample evidence to support probable cause for the search under either of two scenarios.

First, "[p]robable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."  *Chavez*, 534 F.3d at 1344 (quotation marks omitted); *see also Florida v. Harris*, --- U.S. ---, 133 S. Ct. 1050, 1055 (2013) ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present.") (quotation marks omitted).  That standard is easily met in this case.  The same information giving Draper reasonable suspicion to stop Hawley's vehicle also gave him probable cause to search it—the wiretap and surveillance evidence established more than a fair probability that Hawley's vehicle contained a half pound of methamphetamine.  And, under the vertical

- 9 -

collective knowledge rule, Draper could have directed Carroll to search the vehicle (even without the dog sniff) without relaying to him the information establishing probable cause.[7]

Second, the positive alert by the certified drug dog gave Carroll probable cause to search the vehicle. *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007) ("It is undisputed that once the [drug] dog alerted to the trunk and side door, the officers had probable cause to search the car and its contents."); *see also United States v. Ludwig*, 641 F.3d 1243, 1250-51 (10th Cir. 2011) ("[A] positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle."). And, although the district judge determined the task force had a reasonable basis to dispatch a canine officer to the scene and subject Hawley's vehicle to a dog sniff, neither probable cause nor reasonable suspicion is necessary because a dog sniff is not a search under the Fourth Amendment. *Engles*, 481 F.3d at 1245 ("A dog sniff of the exterior of a vehicle parked in a public place does not require reasonable suspicion because it is not a Fourth Amendment intrusion."); *see also Ludwig*, 641 F.3d at 1250 ("It is well settled that a drug

---

[7] Hawley argues Officer Meyer did not, on his own, have probable cause to search her vehicle and he could not rely on the information the task force gleaned from the wiretap and surveillance because it was never communicated to him as required by the "fellow officer" rule. As stated previously, *see supra* n.6, we believe she meant to say he did not have reasonable suspicion to stop her vehicle. Nevertheless, even assuming she means what she says, she is mistaken for three reasons. First, Carroll, not Meyer, searched the vehicle. Second, as we have explained, Draper had probable cause to search the vehicle and, under the vertical collective knowledge rule, he could direct Carroll to perform the search without relaying the probable cause information to Carroll. Finally, as we discuss, Carroll had probable cause to search the vehicle once the drug dog alerted to it.

- 10 -

dog's sniff of the outside of a car is not itself a search for Fourth Amendment purposes and so doesn't require a showing of probable cause to justify it.").

Of course, absent reasonable suspicion of other criminal activity, police may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. *Rodriguez v. United States*, --- U.S. ---, 135 S. Ct. 1609, 1614-16 (10th Cir. 2015). But that did not happen here. The purpose of the stop was to determine whether Hawley was driving under the influence. That purpose could not be completed without the DRE. The dog alerted prior to the DRE's arrival; the dog sniff did not unreasonably prolong the stop. *Id.* at 1616; *see also Illinois v. Caballes*, 543 U.S. 405, 406-09 (2005) (dog sniff that occurred while officer was in the process of writing a warning ticket did not improperly extend the duration of the stop).[8]

## II. Motion for a Mistrial

### A. Background

During jury selection, the judge asked those in the jury pool whether anyone felt "that drugs are a scourge on society." (R. Vol. 3 at 47.) Three prospective jurors indicated yes. When the judge asked one of them to "[t]ell us what you mean by that," he responded:

---

[8] Hawley says there was a 20-minute delay between Officer Meyer's call for a canine officer and his appearance at the scene. Once again, Hawley is mistaken. *See supra* n.6. Officer Draper, not Meyer, called for a canine officer at 1:46 a.m.; canine officer Carroll arrived nine minutes later (1:55 a.m.). Officer Meyer called for a DRE six minutes after the stop; the DRE arrived approximately 11 to 13 minutes later. That is not an unreasonable delay.

- 11 -

I live in Englewood and part of the city is infested with meth. I mean, we call it the hood, that part of it. We say it every day. I think I have seen the—the defendant. I—I think I recognize the person.

(*Id.*) The judge immediately told the prospective juror to "[s]top." (*Id.*) He held a bench conference and asked the attorneys whether they had any objection to dismissing the prospective juror. The government did not object but defense counsel moved for a mistrial (out of the hearing of the jury): "Judge, the whole panel heard that. I mean I submit that's a problem. I think this has infected the panel. He basically said there's [an] area of Englewood that's a meth-infested area." (R. Vol. 3 at 48.) The judge asked where Hawley had lived. One of the prosecutors responded "[s]he is somewhat transient." (*Id.*) When asked whether the offense took place in Englewood, the other prosecutor indicated no, saying "Lakewood, Arapahoe and Santa Fe." (*Id.*) The judge denied the motion and excused the prospective juror.

Shortly thereafter, the judge told the venire:

Now, before we go further, I want to cover, briefly, some things. You need to understand that I can't have a situation where somebody is thinking that they may have seen somebody. I am sure that he is wrong, but I am also sure, that a person believes what a person believes, and you get something in your head, it could impact the trial and the critical issue is being fair.

So this case is not about some open-air market in Englewood and again, I'm not suggesting that the gentleman was trying to do something improper, but I do think that it is inappropriate for an individual to think that he knows one of the people, whether that be the defendant or the Government or anyone else.

So, is there anyone here who does not understand—more importantly, what I'm telling you is this, his comment, *Oh I think I know* . . . is nothing. It is meaningless. It is not in any way, shape or form any form of evidence, should not be considered by you. Is there anyone who has any difficulty with that concept or is unable to follow that instruction?

(*Id.* at 50.) No prospective juror indicated an inability or unwillingness to follow the

instruction.

Hawley later testified to having gone to a friend's house in Englewood upon her release from jail.

### B. Discussion

"[A] district court . . . is in the best position to judge the effect which improper statements might have upon a jury.  The court's ruling on a motion for mistrial based on improper statements during voir dire will therefore be disturbed only on a clear showing of abuse of discretion."[9]  *United States v. Small*, 423 F.3d 1164, 1180 (10th Cir. 2005) (citation and quotation marks omitted).

When improper or prejudicial remarks are made by one member of the venire and heard by another during jury selection, we ask whether the defendant's right to a fair and

---

[9] Hawley claims prejudice is presumed because the prospective juror's comments constituted extraneous information relating to the case and communicated to the jury. *See Remmer v. United States*, 347 U.S. 227, 229 (1954).  She also argues the presumption is conclusive and the issue is unreviewable because the jury has already reached a verdict in this case.  *See United States v. Greer*, 620 F.2d 1383, 1385 (10th Cir. 1980).  We disagree.  First, *Remmer* involved a private communication between a juror and an unknown third party during trial.  347 U.S. at 450-51.  We have found no cases applying *Remmer* in a case such as this, where a presumptive juror provides information to other potential jurors during voir dire, and we decline to extend it in this case.  *See United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995) ("Although we are uncertain that the presumption of prejudice called forth in *Remmer* . . . would apply to communications *among* venirepersons, as opposed to communications from outside sources, we need not resolve that issue here . . . .").  Second, even were the *Remmer* presumption to apply, *Greer* does not make it conclusive.  Hawley relies on the opinion of one judge; the other two panel members disagreed.  620 F.3d at 1386 (Doyle, J., concurring) ("I do not favor having a conclusive presumption approach to the question."); *id.* at 1391 (Barrett, J., dissenting) (rejecting conclusive presumption).

impartial jury was violated by the remarks. *Small*, 423 F.3d at 1180. In other words, "whether the juror[s] can lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." *United States v. McKissick*, 204 F.3d 1282, 1300 (10th Cir. 2000) (quotation marks omitted). "[T]he partiality of the petit jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused from service." *Id.* (quotation marks omitted).

Hawley says the prospective juror's comments about having "recognized [her] as a drug user from Englewood's 'hood'" denied her a fair trial because she was on trial for distributing methamphetamine. (Appellant's Op. Br. at 3-4.) The comments, he adds, were especially prejudicial because they pertained directly to her guilt or innocence.

Hawley is not entirely candid. The prospective juror did not say where he had seen Hawley or how he recognized her, let alone that he recognized her as drug user from Englewood.[10] And he was equivocal—"I *think* I have seen . . . the defendant. I . . . *think* I recognize the person." (R. Vol. 3 at 47 (emphasis added).) That said, we acknowledge our assessment is being made from a cold record and the comments are ambiguous. In context, the remarks could, in total, suggest he recognized her as a drug user. Nevertheless, even assuming the venire construed the comments as Hawley suggests, we see no abuse of discretion.

---

[10] It appears that was the understanding of the judge, who was present when the comments were made. He seemed concerned that the prospective juror believed he recognized Hawley, not that he recognized her as a drug user. In any event, as we explain, even accepting Hawley's interpretation of the comments, the judge did not abuse his discretion in denying a mistrial.

At the time of the statement, the judge had no information linking Hawley to Englewood or to using methamphetamine in Englewood.[11] Hawley argues, however, that her transient nature should have alerted him to the possibility that the prospective juror did recognize her. One of the prosecutors did inform the judge that Hawley was "somewhat transient." (R. Vol. 3 at 48.) But the other prosecutor also (correctly) told him the events of the offense occurred in areas other than Englewood. Thus, the judge reasonably assumed the prospective juror was mistaken and so informed the other members of the venire. And, again, the prospective juror's statement that he recognized Hawley was equivocal.

More importantly, the judge told the venire that the statement was not evidence and should not be considered. He then asked the panel whether anyone would be unable to follow that instruction. No one answered in the affirmative and the judge obviously took them at their word. "Because the district court is in the best position to judge . . . the sincerity of the jurors' pledge to abide by the court's instructions, its assessment is entitled to great weight."[12] *McKissick*, 204 F.3d at 1300. (quotation marks omitted).

Later, once the jury was empaneled and sworn, the judge reiterated that the jury's role was "to find, from the evidence, what the facts are" and told the jurors "[t]hings

---

[11] Hawley's later testimony linked her to Englewood. But she never renewed her motion for a mistrial at that time.

[12] Hawley says the judge "did nothing to dispel the prejudice of [the prospective juror's] statement . . . but merely dismissed [the juror] for bringing it up." (Appellant's Op. Br. at 6.) As we have shown, this is simply not so. *See also supra* n.6.

outside of . . . this courtroom are not evidence." (R. Vol. 2 at 25, 29.)  The judge

repeated this admonition at the close of the evidence:

> You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicion or anything else that you may have seen or heard outside of Court influence your decision in anyway.  The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence and the stipulations to which the lawyers agreed.  Nothing else is evidence.

(R. Vol. 2 at 955.)  We presume the jury followed these instructions and did not consider

the presumptive juror's comments in reaching its verdict.  *Wacker*, 72 F.3d at 1467.

**AFFIRMED**.


**Entered by the Court:**


**Terrence L. O'Brien**
United States Circuit Judge