**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 21, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRUCE MICHAEL LATORRE,

    Defendant - Appellant.

No. 17-8066

———————————————————

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:17-CR-00024-SWS-1)**
———————————————————

Catherine M. Young, Student Director (Tom Fleener, Faculty Director, with her on the briefs), Defender Aid Program, University of Wyoming, Laramie, Wyoming, appearing for Appellant.

Thomas Szott, Assistant United States Attorney (Mark A. Klaassen, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Wyoming, Cheyenne, Wyoming, appearing for Appellee.

———————————————————

Before **BRISCOE**, **KELLY**, and **BACHARACH**, Circuit Judges.

———————————————————

**BRISCOE**, Circuit Judge.

———————————————————

    Defendant Bruce M. Latorre appeals his marijuana trafficking convictions.

Latorre flew a private aircraft from California to New York and was flying back to

California when police detained him in Wyoming. Several law enforcement agencies—

Illinois state police, United States Department of Homeland Security, and Wyoming state police—cooperated to investigate and then stop Latorre's aircraft at an airport in Wyoming, where they received Latorre's consent to search his aircraft and found $519,935 in cash. A grand jury indicted Latorre on two counts: (1) interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a); and (2) conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C). Latorre moved to suppress the evidence from the search of his aircraft, and the district court denied the motion. Latorre then entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress. He now appeals that denial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

# I

This case involves a three-day investigation into Latorre's air travel. Officer[1] Chris Weidler, an Illinois state trooper who supervised the state police's aviation unit, used a radar system to track aircraft flying over Illinois and other parts of the country. On December 7, 2015, he observed an aircraft flying through Illinois airspace without an active transponder.[2] Because the aircraft was flying without an active transponder, Officer Weidler did not have any flight information for the aircraft. That the aircraft was

---

[1] The various law enforcement officials in this case bear specific titles. To help avoid confusion between state and federal officials, we refer to state officials as "Officer" and federal officials as "Agent."

[2] An active transponder transmits information, such as the aircraft's location and altitude, to air traffic control. At the time, it was unclear to Officer Weidler whether the aircraft had a transponder that was broken or turned off, or simply lacked a transponder.

flying without a transponder raised Officer Weidler's suspicions, so he continued to monitor the aircraft until it appeared to land at an airport in Ohio. Officer Weidler called the airport and spoke to an airport employee named John who had just refueled an aircraft. John told Officer Weidler that the pilot: paid in cash; claimed to be on a trip to visit family in Buffalo, New York; and flew an aircraft with the tail number N511FT.

Officer Weidler located the aircraft in a Federal Aviation Administration database, and discovered it was registered to Latorre in California. Officer Weidler had Officer Chad Foster, of the Illinois state police, check Latorre's criminal record. They learned that Latorre had previous arrests for distribution and possession of marijuana, distribution of controlled substances, and weapons charges. Officer Foster also called the United States Customs Air and Marine Operations Center ("AMOC"), the agency responsible for monitoring airspace for criminal activity. AMOC had a record of previous cases involving Latorre, and AMOC's database alerted it whenever Latorre's aircraft was identified on radar. AMOC gave Officer Foster the names and contact information of the federal agents who were attached to Latorre's previous cases, and Officer Foster gave this information to Officer Weidler. Officer Weidler continued to monitor Latorre's aircraft, but the aircraft fell off of radar somewhere east of Cleveland. He called the federal agents identified by AMOC and provided details of his investigation to Special Agent Andrew Stewart, who was with Homeland Security Investigations and based in Nebraska.

The next day, at approximately 9:00 a.m., Officer Foster called Officer Weidler to inform him that an aircraft without an active transponder had just left the Hamburg, New York airport, which is just outside of Buffalo. The aircraft was traveling at the same

3

speed as Latorre was traveling the day before, but going west this time. Officer Weidler found the quick turnaround suspicious for such a long-distance flight, especially considering Latorre had told John the purpose of his Buffalo trip was to visit family. The aircraft appeared and disappeared from radar several times as it flew through Ohio and Indiana into Illinois. The last time Officer Weidler saw the aircraft on his radar that day, it was crossing the Mississippi River into Iowa.

On the third day of the investigation, at approximately 9:00 a.m., Officer Weidler observed an aircraft without an active transponder flying near Lincoln, Nebraska, traveling at the same speed as Latorre was traveling two days earlier and as the unknown aircraft the day prior. The aircraft appeared to land at an airport in Kearney, Nebraska, and depart soon thereafter. Officer Weidler called the airport and spoke with multiple airport employees. Officer Weidler learned an aircraft with the tail number N115FT—the same tail number noted the first day of the investigation and belonging to Latorre—had landed at the airport. He also learned the pilot used a credit card belonging to Latorre and signed the receipt as Latorre. The pilot told the employees he was heading to "Evanston." Officer Weidler began searching for cities named Evanston between Nebraska and California, and found Evanston, Wyoming, which had an airport.

This focus on the Evanston airport set off a series of communications between law enforcement officials. First, Officer Weidler contacted Agent Stewart and updated him with the new information. Agent Stewart then contacted Homeland Security Investigations Special Agent Mathew Lowry, who was based in Salt Lake City, Utah, because he was closer to Evanston, Wyoming. Agent Lowry began the 45-minute drive

4

to Evanston with Homeland Security Investigations Special Agent Ryan Weir. Anticipating that he would not reach the airport in time to intercept Latorre, Agent Lowry called Officer Chad Lichty, a task force officer with the Wyoming Division of Criminal Investigation. Agent Lowry asked Officer Lichty to stall Latorre's aircraft until Officer Lowry arrived. Officer Lichty was busy, so he sent Officer Justin Mathson to the airport.

Dressed in plain clothes, Officer Mathson arrived at the Evanston airport shortly before Latorre's aircraft landed. After refueling, Latorre entered the airport lobby, made eye contact with Officer Mathson, and then began walking back to his aircraft. Officer Mathson followed Latorre to his plane, where Officer Mathson pulled his shirt and coat back to reveal his badge and gun and asked to see Latorre's aircraft registration and pilot's license. After Officer Mathson had engaged in a brief conversation with Latorre, Agents Lowry and Weir arrived.

Latorre agreed to speak with Agents Lowry and Weir inside the airport lobby. Agent Lowry asked Latorre for permission to search his aircraft, and Latorre replied, "Yeah, I don't mind." App'x, Vol. II at 116. Officer Mathson then searched Latorre's aircraft and found a vacuum-sealed bag containing $519,935 in cash. Agent Lowry handcuffed Latorre and read him his *Miranda* rights. During subsequent interviews, Latorre admitted his role in a conspiracy to traffic marijuana to New York and bring money back to California. Six months later, on June 8, 2016, Latorre testified before a grand jury in Buffalo, New York, providing details concerning the marijuana trafficking conspiracy.

5

After a Wyoming grand jury indicted Latorre on January 12, 2017, he moved to suppress evidence from the search of his aircraft. The district court held an evidentiary hearing on Latorre's motion to suppress and issued an oral ruling a week later, denying Latorre's motion to suppress. The district court concluded: (1) Officer Weidler had reasonable suspicion to stop Latorre on the tarmac of the Evanston airport; (2) Officer Mathson's stop was justified under the "collective knowledge" doctrine; (3) Latorre consented to the search of his aircraft; and (4) even assuming the original search was tainted by an unconstitutional detention, Latorre's grand jury testimony was freely and voluntarily given and untainted by the unconstitutional detention.

Latorre entered into a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. The district court sentenced him to concurrent terms of 24 months' imprisonment on each count, concurrent terms of 3 years of supervised release, and financial penalties totaling $2,000. Latorre timely appealed.

## II

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Saulsberry*, 878 F.3d 946, 949 (10th Cir. 2017) (quoting *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017)). We conclude Latorre's constitutional rights were not violated by either Officer Mathson's detention of Latorre or his subsequent search of Latorre's aircraft. As a result, we affirm

6

the district court's denial of Latorre's motion to suppress.[3]

## A.    Whether the detention was constitutional

The Fourth Amendment protects persons "against unreasonable searches and seizures." U.S. Const. amend. IV. Although an arrest requires probable cause, "a law enforcement officer may, in appropriate circumstances and in an appropriate manner, approach a person to investigate possible criminal behavior even if he lacks probable cause to arrest." *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012). Such "[a]n investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (quotation omitted).

However, not all police encounters rise to the level of an investigatory detention. *See United States v. Lambert*, 46 F.3d 1064, 1067 (10th Cir. 1995) ("If a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and the Fourth Amendment is not implicated." (quotation omitted)). But, when the police request, obtain, and keep a person's identification documents, the police encounter becomes an investigatory detention. *See id.* at 1068 ("[W]hat began as a

---

[3] Because we determine that both the stop and subsequent search were constitutional, we need not reach the district court's alternative holding that, assuming the original search was tainted by an unconstitutional stop, Latorre's eventual grand jury testimony was freely and voluntarily given and untainted by the unconstitutional detention.

consensual encounter quickly became an investigative detention once the agents received Mr. Lambert's driver's license and did not return it to him.").

Officer Mathson's encounter with Latorre became an investigatory detention once he kept Latorre's pilot's license and registration. The government concedes that Officer Mathson's encounter with Latorre was an investigatory detention. Aple. Br. at 14 (acknowledging "the encounter ripened into investigative detention when Mathson continued questioning Latorre without returning his documents").

The government argues the investigatory detention was justified because: (1) Officer Weidler had reasonable suspicion to stop Latorre, and (2) Officer Weidler's reasonable suspicion was imputed to Officer Mathson through the "collective knowledge" doctrine. We address each point in turn. *Cf. United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008) ("We will analyze this initial issue in two steps, asking first whether the DEA task force agents had probable cause to believe [the defendant]'s vehicle contained narcotics. . . . Second, we query whether the DEA task force's probable cause could be imputed to [the officer who stopped and searched the defendant's vehicle].").

### 1. Whether Officer Weidler had reasonable suspicion to stop Latorre

When conducting a reasonable suspicion analysis, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted). This approach "precludes [a] divide-and-conquer analysis," where the court views each factor that would support reasonable

8

suspicion in isolation. *Id.* at 274. As a whole, reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In this analysis, "the officer's subjective motives are irrelevant." *Chavez*, 534 F.3d at 1344. Instead, "we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Whitley*, 680 F.3d at 1234 (quotation omitted). We "need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. "[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *McHugh*, 639 F.3d at 1256 (quotation omitted). "[W]e defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Id.* (quotation omitted).

The district court concluded: "Based on Mr. Latorre's unusual and unsafe flying behavior, . . . the cross-country travel and quick turnaround, . . . and history of drug trafficking and AMOC's listing of his aircraft on the list, [Officer] Weidler reasonably suspected Latorre was transporting illegal drugs in his airplane." App'x, Vol. II at 193. We agree.

At least three factors, taken together, support reasonable suspicion here: Latorre's unusual travel itinerary, the lack of an active transponder, and Latorre's criminal history.

First, "[w]e have consistently held that implausible travel plans can contribute to reasonable suspicion." *United States v. Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015). Latorre flew from California to New York, spent one night in New York, and began the two-day flight back to California the next morning. Traveling a long distance, only to

9

stay one night at his destination, contributes to reasonable suspicion here just as it has in other cases. *Cf. Sokolow*, 490 U.S. at 9 ("While a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July."); *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) (holding unusual travel supported reasonable suspicion where the defendant drove "more than 1,200 miles to see her family, only to turn around within a day and begin the 1,200-mile drive back").

Second, Latorre embarked on two cross-country flights without an active transponder. Officer Weidler found this type of behavior unusual and suspicious because transponders add a level of safety for pilots, as they transmit the aircraft's altitude to air traffic control to prevent collisions with other aircraft. App'x, Vol. II at 24, 26. Thus, by flying without an active transponder, Latorre was "forfeiting some of the safety . . . that a transponder provides" in exchange for "[d]iscreetness, someone not being able to track [the] aircraft." *Id.* at 48; *see also United States v. Rosales*, 687 F. App'x 135, 138 (3d Cir. 2017) (unpublished) (concluding that "turning off the plane's transponder" supported reasonable suspicion because it showed the defendant "engaged in apparent efforts to attempt evasion"). Although this court has not issued a published opinion addressing this specific factual scenario—reasonable suspicion arising from flying a plane without an active transponder—we have held in other contexts that behavior to avoid detection may contribute to reasonable suspicion. *See, e.g.*, *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001) (holding the presence of a two-way, short-range radio in a car

10

during a traffic stop supported reasonable suspicion because "cars traveling in tandem and transporting drugs sometimes used such radios to avoid detection by law enforcement personnel"); *United States v. Barbee*, 968 F.2d 1026, 1028–29 (10th Cir. 1992) ("An agent's belief that passengers are slouching down to avoid detection may create reasonable suspicion." (quotation omitted)).  That logic applies as well in this case— flying without an active transponder contributes to reasonable suspicion because it demonstrates an interest in avoiding detection even at the risk of increased danger.

Third, Officer Foster informed Officer Weidler that Latorre "had previous arrests for distribution and possession of marijuana, distribution of controlled substances, and weapons charges."  App'x, Vol. II at 37.  Officer Weidler also learned that AMOC had previous cases involving Latorre and its database was set to alert AMOC if Latorre's aircraft was ever identified on radar.[4]  *Id.* at 38.  "[W]hen viewed in conjunction with other factors that suggest criminal activity may be occurring, criminal history can be a powerful contributor to the reasonable suspicion analysis."  *United States v. Moore*, 795 F.3d 1224, 1230 (10th Cir. 2015); *but see United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("To be sure, this Court has held that a prior criminal history is by itself insufficient to create reasonable suspicion.").

---

[4] This furthers the import of the second factor.  It makes sense that an officer would be suspicious of an aircraft that is attempting to be discreet, especially when that aircraft is on a watch list that alerts AMOC when the aircraft is identified in flight.

Latorre argues that "many of the factors relied upon were so innocent or susceptible to varying interpretations that they should have been dismissed."[5]  Aplt. Br. at 13 (quotation omitted).  But "reasonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *McHugh*, 639 F.3d at 1256 (quotation omitted).  This is because reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7. Viewing the totality of the circumstances, Officer Weidler met the "minimal level of objective justification for making [a] stop." *Id.* (quotation omitted).

### 2.     Whether the collective knowledge doctrine imputes Officer Weidler's reasonable suspicion to Officer Mathson

Although Officer Weidler had reasonable suspicion to stop Latorre, Officer Weidler did not perform the actual stop—Officer Mathson did.  The district court, however, concluded that it could rely on the collective knowledge doctrine to impute Officer Weidler's reasonable suspicion to Officer Mathson.  We agree.

"Under the collective knowledge doctrine, the officer who makes a stop or conducts a search need not have reasonable suspicion or probable cause." *United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017).  "Instead, the reasonable suspicion or probable cause of one officer can be imputed to the acting officer." *Id.*

---

[5] The district court relied on more factors than the three we highlight here. *See, e.g.*, App'x, Vol. II at 193 (relying, in part, on Latorre's "area of origin" and "unusual behavior" at the airports).  Because we hold that Officer Weidler had reasonable suspicion based on the three factors we describe, we need not determine whether additional factors would further support reasonable suspicion.

There are two types of collective knowledge—horizontal and vertical. "Under the horizontal collective knowledge doctrine, a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard." *Whitley*, 680 F.3d at 1234 n.3. "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Id.* at 1234. "Of course, the officer who has probable cause may possess that information as a result of communication from other officers. Thus, the 'horizontal' and 'vertical' collective knowledge categories are by no means mutually exclusive." *Chavez*, 534 F.3d at 1345 n.12. Here, there are four key knowledge relationships: (1) Officer Weidler to Agent Stewart; (2) Agent Stewart to Agent Lowry; (3) Agent Lowry to Officer Lichty; and (4) Officer Lichty to Officer Mathson.

Our ruling in *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223 (10th Cir. 2008), is instructive regarding the application of the collective knowledge doctrine. In *Rodriguez-Rodriguez*, Officer Marquez observed a brown pickup and a red car driving in tandem, and pulled the brown pickup over for a traffic violation. 550 F.3d at 1225. As Officer Marquez approached the brown pickup, he smelled marijuana and saw suspicious bundles scattered throughout the vehicle. *Id.* When he called for backup, the driver of the brown pickup fled on foot. *Id.* at 1226. Eventually, Officer Arellano arrived in response to Officer Marquez's call for assistance, and Officer Marquez "then told Arellano that he had seen a red four-door vehicle with a California license plate and

13

tinted windows driving erratically that Marquez concluded was traveling in tandem with the brown pickup." *Id.* at 1227. Officer Arellano then issued an alert for the red car; a third officer found and stopped the car. *Id.* at 1227–28.

We acknowledged that, "[i]n the ordinary case involving reliance on an alert issued by an officer with firsthand knowledge, the court analyzes whether the issuing officer had reasonable suspicion to support a stop." *Id.* at 1227. "Here, however, as described above, the officer who observed the facts supporting probable cause did not himself issue the alert." *Id.* We concluded that "[t]his minor factual variation need not alter our analysis" because "the fact that Arellano rather than Marquez actually sent the alert is immaterial." *Id.* at 1228. As a result, "we need only inquire whether Officer Marquez had probable cause to believe that [the driver of the red car] was committing a crime." *Id.*

In addition, *Rodriguez-Rodriguez* characterized its facts as "a case of two 'vertical' collective knowledge relationships in which the first officer's conclusion was conveyed twice to reach the officer who conducted the stop." *Id.* at 1228 n.5. Even though Officer Marquez did not issue the alert himself, and instead simply told Officer Arellano some of the suspicious facts, *Rodriguez-Rodriguez* was not a horizontal collective knowledge case because it "d[id] not involve a . . . relationship in which the knowledge of several officers must be aggregated to create probable cause." *Id.*; *see also Chavez*, 534 F.3d at 1347 ("Rather than a horizontal pooling of discrete pieces of information, one officer here . . . had all the requisite probable cause components; the

14

question then is whether that information can be imputed vertically to another officer
. . . .").

Applying those principles here, this case involves multiple vertical collective knowledge relationships in which the first officer's conclusion was conveyed four times to reach the officer who conducted the stop. This is because, as in *Rodriguez-Rodriguez*, there is no "pooling" required—Officer Weidler had within his own knowledge sufficient facts to support reasonable suspicion. It is true that neither Officer Weidler nor Agent Stewart issued an alert or a request to stop Latorre. But just as in *Rodrgiuez-Rodriguez*, "[t]his minor factual variation need not alter our analysis," 550 F.3d at 1228. Accordingly, this court need only inquire whether Officer Weidler had reasonable suspicion to believe that Latorre was committing a crime. Because Officer Weidler did have reasonable suspicion, Officer Mathson's investigatory stop was lawful.

Latorre argues his stop was not supported by reasonable suspicion because Officer Mathson was too far removed from Officer Weidler, who we conclude had reasonable suspicion. Our prior collective knowledge cases have involved only one or two vertical relationships. This case arguably involves four. Latorre cautions that this level of attenuation "would result in a significant expansion of the collective knowledge doctrine if applied to impute [Officer] Weidler's knowledge all the way down to [Officer] Mathson." Aplt. Reply at 4–5.

But the vertical collective knowledge doctrine only requires "some communication between the officer or officers with probable cause and the officer who executes the stop or search," because the communication "confirms that the officers are

15

functioning as a team." *Chavez*, 534 F.3d at 1347 n.13. Here, there was significant communication between Officer Weidler and the law enforcement officials who effected the stop and then questioned Latorre. Officer Weidler even stayed on the phone with federal agents as Latorre landed at the Evanston airport, updating the agents on Latorre's flight. App'x, Vol. II at 63–64. Although Officer Weidler never directly communicated with Officer Mathson, that is not unusual in vertical collective knowledge cases. *See, e.g.*, *Rodriguez-Rodriguez*, 550 F.3d at 1227–28. Nor is it unusual for officers in different states to share collective knowledge. *See, e.g.*, *Pickel*, 863 F.3d at 1250 (applying the vertical collective knowledge doctrine where two Kansas detectives requested Nebraska highway patrol stop a truck, and the Nebraska patrol sergeant then conveyed the request to a Nebraska state trooper who performed the stop).

The facts presented in this case demonstrate that the Illinois state police, Homeland Security, and Wyoming state police all functioned as a team to stop and question Latorre. This type of interstate and interagency effort is necessary to pursue and complete an interstate investigation involving an aircraft in transit—that Officer Weidler did not directly communicate all facts supporting reasonable suspicion to Officer Mathson does not negate the constitutionality of the stop. *See United States v. Hensley*, 469 U.S. 221, 231 (1985) ("In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.").

16

Latorre's other arguments fare no better. For example, Latorre argues that "Mathson . . . did not believe that he could lawfully detain Mr. Latorre." Aplt. Br. at 27. But we consider the reasonableness of an officer's actions using an objective standard. "The detaining officer's subjective beliefs and intentions are, quite simply, irrelevant." *McHugh*, 639 F.3d at 1256 (quotation omitted).

In addition, Latorre makes a policy argument that condoning the officers' actions here "would encourage an officer who lacks information sufficient to establish reasonable suspicion or probable cause to 'roll the dice and conduct the search anyway, in the hopes that uncommunicated information existed' that would justify it." Aplt. Br. at 27–28 (quoting *United States v. Massenburg*, 654 F.3d 480, 494 (4th Cir. 2011)). This case does not implicate that concern. Officer Mathson was not functioning as a rogue officer who was unaware of an ongoing investigation into Latorre. Rather, he was acting in direct reliance on information and requests from federal agents, whom he knew gathered information from the Illinois state police. And at bottom, Officer Weidler had reasonable suspicion, which supported Officer Mathson's stop of Latorre and the basis for his reasonable suspicion had been conveyed to other agents and officers prior to the stop.

In a prior unpublished decision, a panel of this court endorsed the policy justifications behind the vertical collective knowledge doctrine, even in cases where the detaining officer knows little or nothing about the facts giving rise to the stop:

> The reasons for the "fellow officer" rule are obvious. Police officers do not often have the luxury of time and should be able to reasonably rely on the information provided by other officers without having to cross-examine them about the foundation for the transmitted information. The public benefits as well when police

17

officers are allowed to efficiently perform their duties. At the same time, the intrusion on a defendant's personal security is minimal— little, if any, additional individual freedom would result from requiring officers to set forth their grounds for reasonable suspicion or probable cause in their communications with other officers. Moreover, defendants . . . still have the opportunity to challenge the claimed reasonable suspicion under the Fourth Amendment but must properly direct their challenges.

*United States v. Hawley*, 660 F. App'x 702, 707 (10th Cir. 2016) (unpublished) (quotations and brackets omitted); *see id.* at 706 (applying the vertical collective knowledge doctrine where one officer had reasonable suspicion and instructed another officer to perform a stop without telling the officer the facts giving rise to reasonable suspicion).

Because Officer Weidler had reasonable suspicion to stop Latorre, and because that reasonable suspicion is imputed to Officer Mathson through the vertical collective knowledge doctrine, Officer Mathson's investigatory stop was lawful.

**B.      Whether the search was constitutional**

We must next determine whether Officer Mathson's warrantless search of Latorre's plane was constitutional. As a general rule, a "warrantless search . . . is presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). "Voluntary consent to search is one such exception." *Id.* The district court found: "During the lawful period of investigative detention, Mr. Latorre voluntarily consented to the search of his airplane." App'x, Vol. II at 196. We agree.

18

We apply a two-part test for voluntary consent: "(1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012). Here, it is undisputed that Latorre gave the law enforcement officers express consent to search his aircraft. *See* App'x, Vol. II at 116 (Agent Lowry's testimony); *id.* at 187 (district court finding Latorre gave oral consent); Aplt. Br. at 35–36 (limiting Latorre's argument to whether consent was *voluntarily* given). Thus, we turn our focus to the second step.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *see also Harrison*, 639 F.3d at 1277 ("Whether consent was voluntarily given is a question of fact we review for clear error."). In the totality-of-the-circumstances analysis, we consider:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Jones*, 701 F.3d at 1318 (quoting *Harrison*, 639 F.3d at 1278). "Additionally, an individual may voluntarily consent to a search even though he is detained." *United States v. Davis*, 636 F.3d 1281, 1293 (10th Cir. 2011). "The detention is only one factor to be

19

considered in determining whether consent was voluntarily and freely given based on the totality of the circumstances." *Contreras*, 506 F.3d at 1037.

Latorre argues he did not freely and voluntarily consent to the search of his aircraft because: (1) "the agents did not read Mr. Latorre his *Miranda* rights until they had obtained his consent and searched his aircraft," Aplt. Br. at 35; (2) "the agents did not inform him of his right to refuse consent," *id.* at 35–36; (3) "Agent Mathson also displayed his weapon to Mr. Latorre prior to obtaining his consent," *id.* at 36; and (4) "they only obtained his consent after retaining his documents," *id.*

Those facts do not represent the "totality of the circumstances." Although Officer Mathson had previously pulled his coat behind his badge and firearm to display them to Latorre on the tarmac, Officer Mathson never touched his firearm. App'x, Vol. II at 84; *cf. United States v. Medlin*, 842 F.2d 1194, 198 (10th Cir. 1988) (considering it "reasonable" the defendant "would have believed when faced by federal and state officers with guns drawn that he had no right to [refuse consent]"). During Latorre's subsequent conversation with Agent Lowry and Agent Weir, which took place in the public lobby of an airport, the agents wore street clothes and did not display their weapons. App'x, Vol. II at 112–13, 123. Officer Mathson was present, but he stood away at the door. *Id.* at 112. Agent Lowry and Agent Weir had a calm conversation with Latorre. *Id.* at 89. They did not threaten him or make any promises to him. *Id.* at 115. Latorre appeared to understand what the agents were talking about. *Id.* At the time Latorre gave consent, he was not handcuffed. *Id.* at 117. Latorre's documents were on the chair between him and Agent Lowry. *Id.* at 112, 114. There is no evidence that the agents coerced Latorre's

20

consent to search his plane with a show of authority—in fact, Agent Lowry testified that he believed he told Latorre he was free to leave at any time.  *Id.* at 114.

Under these facts, "a reasonable person would believe he was free to leave or to deny the officer's request to search."  *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007).  The district court did not commit clear error when it found Latorre's consent was freely and voluntarily given.

## III

Because both the investigatory stop and subsequent search of Latorre's aircraft were constitutional, we AFFIRM the denial of Latorre's motion to suppress evidence.